## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE (K.S.), | |
| Plaintiff | |
| | CIVIL ACTION NO:1:23-cv-04032 |
| v. | |
| BRISAM CLINTON LLC D/B/A COMFORT INN, MK LCP RYE LLC D/B/A HILTON, BRE/PRIME MEZZ LLC D/B/A LA QUINTA INN & SUITES, LA QUINTA HOLDINGS INC., CHOICE HOTELS INTERNATIONAL, INC., WYNDHAM HOTELS & RESORTS, LLC, HILTON RESORTS CORPORATION, AND HILTON MANAGEMENT LLC, | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants | |

COMES NOW Plaintiff Jane Doe (K.S.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

### SUMMARY

1.     As sex trafficking has grown to epidemic proportions, it has become widely recognized that we must look beyond just the pimp and sex buyer in order to stop sex trafficking. We must look to the other individuals and entities who facilitate and benefit from sex trafficking.

2.     The facilitation of sex trafficking is unlawful under federal law. The Trafficking Victims Protection Reauthorization Act ("TRVPA"), 18 U.S.C. § 1581, *et seq*, expands trafficking liability beyond the sex seller and buyer to also prohibit individuals or entities from knowingly benefiting or attempting to benefit "financially or by receiving anything of value from participation in a venture which that person knew or should have known" was engaged in trafficking.

1

3.      As discussed herein, each of the defendants in this case knowingly benefitted from participation in a venture that facilitated trafficking and ultimately, K.S.'s trafficking. Accordingly, K.S. brings suit under the TVPRA.

## JURISDICTION & VENUE

4.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

6.      K.S. was trafficked in this District and Division.

## PARTIES

7.      K.S. is a natural person who is currently a resident and citizen of Florida.

8.      Defendant Brisam Clinton LLC d/b/a Comfort Inn is incorporated under the laws of the State of New York and has its principal place of business at 343 W 44th St, New York, NY 10036. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the Comfort Inn located at 343 W 44th St, New York, NY 10036.

9.      Defendant MK LCP Rye LLC d/b/a Hilton is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York. It can be served by its registered agent C/O Mount Kellet Capital Management LP Attn: Michelle Chen, 623 Fifth Avenue, 18th Floor, New York, NY 10022. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the Hilton located at 699 Westchester Ave, Rye Brook, NY 10573.

10.     Defendant BRE/Prime Mezz LLC d/b/a La Quinta and Suites is a company doing business in New York. It can be served by its registered agent Corporation Trust Company,

Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the La Quinta Inn & Suites located at 540 Saw Mill Rd, Elmsford, NY 10523.

11.   Defendants Brisam Clinton LLC, MK LCP Rye LLC, and BRE/Prime Mezz LLC will collectively be referred to as "Franchisee Defendants."

12.   Defendant Wyndham Hotels & Resorts, LLC d/b/a La Quinta Inn & Suites ("Wyndham") is incorporated under the laws of the State of Delaware. It can be served by its registered agent Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building Ste 104, Wilmington, DE 19810. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the La Quinta located at 540 Saw Mill Rd, Elmsford, NY 10523.

13.   Defendant La Quinta Holdings Inc. is incorporated under the laws of the State of Delaware. It can be served by its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building Ste 104, Wilmington, DE 19810.  Upon information and belief, La Quinta Holdings Inc. is a successor in interest to some portion of the assets and liabilities of BRE/Prime Mezz LLC.[1]

14.   Defendant Choice Hotels International, Inc. d/b/a Comfort Inn ("Choice") is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York. It has its principal place of business at 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850 and can be served by its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the Comfort Inn located at 343 W 44th St, New York, NY 10036.

---

[1] Based on La Quinta Holdings Inc.'s 2014 Form 10-K filing with the Securities and Exchange Commission wherein La Quinta Holdings Inc. reported, "On April 14, 2014, we acquired BRE/Prime Mezz L.L.C. and BRE/Wellesley Properties L.L.C., which owned the Previously Managed Hotels…."

15.     Defendant Hilton Management LLC d/b/a Hilton is incorporated under the laws of the State of New York and can be served by its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207. Defendant Hilton Resorts Corporation is a Delaware Corporation and is registered to do business in the State of New York. It can be served by its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207. They collectively will be referred to as "Hilton." Upon information and belief, at all relevant times they owned, operated, controlled, and/or managed the Hilton located at 699 Westchester Ave, Rye Brook, NY 10573.

16.     Choice, Wyndham, and Hilton will collectively be referred to as "Franchisor Defendants."

## FACTS

### The Hotel Industry's Role in Sex Trafficking

17.     What Defendants knew or should have known about the sex trafficking that was occurring in their jointly operated hotel, including the trafficking of K.S., is shaped by the widely known and pervasive relationship between the hotel industry and sex trafficking.

18.     Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking, both directly and indirectly, from sex trafficking that occurs at their properties. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[3] In 2014, 92% of calls

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90% of commercial exploitation of children.[5]

19. To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

20. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[7]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

---

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.
[5] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[6] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[7] *See Id.*

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

21.    Recognizing the unique vantage point that that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. In order to meet that responsibility, several (if not most) major hotel chains have adopted robust anti-human trafficking policies to train its employees to identify and properly respond to the "red flags" of sex trafficking. Each and every Defendant named herein had the opportunity and responsibility to adopt, implement, and enforce similar policies at their hotels. Unfortunately for K.S., such policies were not in place or were not enforced at their hotels.

**The Use of La Quinta Branded Properties for Sex Trafficking is Prevalent**

22.     The use of La Quinta hotels for sex trafficking is well known to Defendants. Scores

of news stories dating back as far as 2011, prior to K.S.'s trafficking, highlight the La Quinta

Defendants' knowledge of such conduct. Each and every La Quinta Defendant knew, or should

have known, of the use of La Quinta branded hotels for sex trafficking. Among other notable press

involving the frequent use of La Quinta hotels for illegal activity, the following was reported:

- "Four Atlanta-area women have been arrested on prostitution charges at a local hotel as part of an FBI-led initiative targeting child exploitation and child prostitution nationwide. The women, ranging in age from 18 to 22, were arrested Friday, July 26, at LaQuinta Inn…";[8]

- "After he dropped [the 15 year-old girl] off at the La Quinta Inn & Suites…last week, the girl solicited an undercover police officer for sex - and was promptly arrested as part of a nationwide FBI-led crackdown on child prostitution.";[9]

- "Raleigh police responded to the La Quinta Inn…where the victim said she was forced into the commercial sex trade, the warrant said;"[10]

- "On May 23, a 16-year-old Georgia girl was found inside the La Quinta Inn… [with a 61 year old man] in Tallahassee. Both were nude when officers with the Tallahassee Police Department arrived;"[11]

- A La Quinta "hotel has been ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel…must now install more security cameras and signs to deter criminal activity. The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."[12]

---

[8] https://www.rockdalenewtoncitizen.com/news/four-arrrested-on-prostitution-charges-as-part-of-fbi-effort/article_19553201-4d38-5036-a0eb-6514d193488e.html
[9] https://www.sfgate.com/crime/article/How-girls-fall-into-clutches-of-pimps-4705407.php
[10] https://www.wral.com/larceny-call-unveils-family-run-sex-trafficking-ring/14031981/
[11] https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/
[12] https://www.nbcsandiego.com/news/local/la-quinta-hotel-rancho-penasquitos-san-diego-paseo-montril/2050904/

23.    These and other news stories show that the use of La Quintas for sex trafficking was not isolated to one La Quinta or geographic area and the common use of La Quintas for sex trafficking turned into a nationwide problem that stemmed from decisions at the top.

24.    Each La Quinta Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at La Quinta branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the subject La Quinta frequently and long after the trafficking of the Plaintiff.

**K.S. Was Trafficked at the La Quinta**

25.    One of the lives devalued and otherwise adversely affected by La Quinta Defendants' inattention to the prevention and eradication of sex trafficking was K.S.

26.    During various times from approximately July to September to 2013, K.S. was repeatedly trafficked for sex at the La Quinta Inn & Suites located at 540 Saw Mill Rd, Elmsford, NY 10523.

27.    The hotel rooms in which K.S. was trafficked were often paid for with cash.

28.    Other girls were being trafficked at the same hotel at the same time as K.S.

29.    There was also heavy foot traffic in and out of K.S.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

30.    Defendants continued to allow illegal activities, including prostitution, to occur at the subject La Quinta, according to internet reviews.

- April 28, 2014 Yelp review states "If you have money, don't be cheap and go somewhere that doesn't have prostitutes waiting by the back double doors."[13]

---

[13] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford.

- November 1, 2017 Yelp review states "Crime hot spot. Police are here often. Drugs. Hookers. Good luck you'll need it. Overdose. Crazy people. Not sure if the staff cares or not."[14]

31.     Because policies purportedly enacted and enforced by Wyndham to identify signs of sex trafficking and stop it from occurring were not properly implemented at the La Quinta, K.S.'s trafficker was able to continue the trafficking venture at the La Quinta. Had Defendant Wyndham enforced the policies and procedures they enacted to prevent trafficking from occurring within their La Quinta branded hotels after observing an obvious sign of trafficking as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the La Quinta. Furthermore, had BRE/Prime Mezz LLC properly followed the franchise policies enacted by Wyndham to identify and prevent trafficking from occurring at La Quinta branded hotels as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the La Quinta.

32.     Despite obvious signs of human trafficking and indicators of commercial sex activity, La Quinta Defendants failed to recognize, stop, or report the venture occurring on the premise that resulted in K.S.'s trafficking and consequently, actively facilitated the trafficking venture. The La Quinta Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, benefited, financially and otherwise, from the sex trafficking the Plaintiff suffered. Furthermore, the La Quinta Defendants failed to prevent her continued victimization.

33.     Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject La Quinta,

---

[14] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford

despite the obvious signs of sex trafficking and commercial sex taking place there because said Defendants were actively engaged in facilitation of and benefiting from said activities.

**The Use of Comfort Inn Branded Properties for Sex Trafficking is Prevalent**

34.     The use of Comfort Inn hotels for sex trafficking is well known to Choice Defendants. Choice Defendants has known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct.[15] Choice Defendants knew, or should have known, of the use of Comfort Inn branded hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put Choice Defendants on notice of the frequent use of Comfort Inn hotels including the subject Comfort Inn

---

[15] *See, e.g.*, Amanda Covarrubias, *Five Arrested After Months-Long Investigation Into Human Trafficking Ring* (Aug. 23, 2016), https://www.vcstar.com/story/news/crime/2016/08/23/five-arrested-after-monthslong investigation-into-human-trafficking-ring/89254044/ (Five men arrested in Ventura County, California at a Comfort Inn for forcing at least 28 women into prostitution); The Bakersfield Californian, *Man Arrested On Suspicion Of Human Trafficking* (Feb. 25, 2016), https://www.bakersfield.com/news/breaking/man-arrested-on-suspicion-ofhuman-trafficking/article3f5f6ee8-008e-5ef9-ad28-5f4ecb667alc.html (Suspect arrested in Bakersfield, California at a Quality Inn on suspicion of human trafficking of a minor); The East Carolinian, *GPD Discovers Child Prostitution* (Dec. 2, 2014), http://www.theeastcarolinian.com/news/article_59f8d72a-79c9-11e4-86d3eb5396cc62f5.html (Arrest made in Greenville, North Carolina for human trafficking of a fourteen-year-old girl at a Quality Inn); ClarkvilleNow.com, *Oak Grove Police Sergeant, Two Others Arrested During Prostitution Investigation* (Sept. 28, 2016), http://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during prostitution-investigation/ (Three arrested in Oak Grove, Kentucky and charged with human trafficking after holding a woman against her will at a Quality Inn and forcing her to have sex with several men); Christopher Hoffman, The Hartford Courant, *Wethersfield Police Break Up Motel Prostitution Operation* (Jul. 11, 2014), http://articles.courant.com/2014-07-11/community/hc-wethersfield-prostitution-0711-20140710_1_prostitutesaffidavits-police-break (Comfort Inn management arrested in Wethersfield, Connecticut for promoting prostitution at the hotel); Thomasi McDonald, *Raleigh Police Charge Wilson Man With Forcing Child Into Prostitution* (Feb. 11, 2016), http://www.newsobserver.com/news/local/crime/article59910551.html (Man arrested in Raleigh, North Carolina for human trafficking and prostitution of a fifteen-year-old girl at an Econo Lodge -- also a Choice brand hotel); Megan Brockett, Capital Gazette, *Laurel Hotels Among Those Named In Human Trafficking Indictments* (Aug. 16, 2016), http://www.capitalgazefte.com/news/for  the_record/ph-ac-cn-human-trafficking-0817-20160816story.html  (Three arrested in Prince George's County, Maryland in a large-scale human trafficking venture which operated in part out of an Econo Lodge); Josh Kovner and Suzanne Carlson, *The Hartford Courant, Federal Task Force Targets Sex Trafficking Of Minors In Connecticut* (Nov. 5, 2015), http://www.courant.com/news/connecticut/hc-minor-sex-traffic-1104-20151104-story.html (Arrest made in East Hartford, Connecticut for human trafficking of a minor at a local Econo Lodge).

for commercial sex and other associated illegal activity. For example, on November 10, 2009, a young child was trafficked, raped and killed at a Comfort Inn in Fayetteville, North Carolina.[16]

35.     These and other news stories show that the use of Comfort Inns for sex trafficking was not isolated to one Comfort Inn or geographic area and the common use of Comfort Inn for sex trafficking turned into a nationwide problem that stemmed from decisions at the top.

36.     Each Choice Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Comfort Inn branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the subject Comfort Inn frequently and long after the trafficking of the Plaintiff.

**K.S. Was Trafficked at the Comfort Inn**

37.     At various times in April and May 2013, K.S. was repeatedly trafficked for sex at the Comfort Inn located at 343 W 44th St, New York, NY 10036.

38.     There was heavy foot traffic in and out of K.S.'s room involving men who were not hotel guests.

39.     These individuals had to pass the front desk to get to K.S.'s room.

40.     These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

41.     Defendants continued to allow illegal activities, including prostitution, to occur at the subject Comfort Inn, according to internet reviews.

- November 24, 2019 Expedia review states "I think there is some sort of prostitution situation happening at this hotel."[17]

---

[16] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009),
http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)
[17] https://www.expedia.com/New-York-Hotels-Comfort-Inn-Times-Square-West.h2774542.Hotel-Reviews.

42.     Because policies purportedly enacted and enforced by Choice to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Comfort Inn, K.S.'s trafficker was able to continue the trafficking venture at the Comfort Inn. Had Defendant Choice enforced the policies and procedures they enacted to prevent trafficking from occurring within their Comfort Inn branded hotels after observing an obvious sign of trafficking as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Comfort Inn. Furthermore, had Brisam Clinton LLC properly followed the franchise policies enacted by Choice to identify and prevent trafficking from occurring at Comfort Inn branded hotels as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Comfort Inn.

43.     Despite obvious signs of human trafficking and indicators of commercial sex activity, Choice Defendants failed to recognize, stop, or report the venture occurring on the premise that resulted in K.S.'s trafficking and consequently, actively facilitated the trafficking venture. The Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, benefited, financially and otherwise, from the sex trafficking the Plaintiff suffered. Furthermore, the Defendants failed to prevent her continued victimization.

44.     Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject Comfort Inn, despite the obvious signs of sex trafficking and commercial sex taking place there because said Defendants were actively engaged in facilitation of and benefiting from said activities.

**The Use of Hilton Branded Properties for Sex Trafficking is Prevalent**

45.     The use of Hilton hotels for sex trafficking is well known to Hilton Defendants. Defendants have known for years that pimps and traffickers use their hotels to carry out their

crimes. Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct.[18]  Significantly, a prostitution bust involving the **exact same hotel** was done four year prior to K.S.'s trafficking.[19] Defendants knew, or should have known, of the use of Hilton branded hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter are notable complaints that put Defendants on notice of the frequent use of Hilton hotels including the subject Hilton for commercial sex and other associated illegal activity.

46.    These and other news stories show that the use of Hiltons for sex trafficking was not isolated to one Hilton or geographic area and the common use of Hiltons for sex trafficking turned into a nationwide problem that stemmed from decisions at the top.

47.    Each Hilton Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Hilton branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the subject Hilton frequently and long after the trafficking of the Plaintiff.

**K.S. Was Trafficked at the Hilton**

48.    At various times from June to September 2013, K.S. was repeatedly trafficked for sex at the Hilton located at 699 Westchester Ave, Rye Brook, NY 10573.

49.    There was heavy foot traffic in and out of K.S.'s room involving men who were not hotel guests. Housekeeping saw these men come in and out of the rooms.

---

[18] *Prostitution bust in Westchester Co.* (Oct. 8, 2009), https://abc7ny.com/archive/7055026/; St. John Barned-Smith, 'Pimp of the Pike' to serve more than 10 years for running prostitution ring, The Washington Post (May 8, 2013), https://www.washingtonpost.com/local/pimp-of-the-pike-to-serve-more-than-10-years-for-running-prostitution-ring/2013/05/08/3387a69c-b7e3-11e2-b94c-b684dda07add_story.html

[19] *Prostitution bust in Westchester Co.* (Oct. 8, 2009), https://abc7ny.com/archive/7055026/ ("They recruited, managed and scheduled nearly three dozen women sending them on calls to many Westchester hotels, including the Rye Town Hilton").

50.     These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

51.     Other girls were being trafficked at the same hotel at the same time as K.S., and K.S. always had to share a room with another girl.

52.     When K.S. was with an individual, the other girl would sit in the hotel lobby and wait and K.S. would do the same when the other girl was with someone.

53.     Because policies purportedly enacted and enforced by Hilton to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Hilton, K.S.'s trafficker was able to continue the trafficking venture at the Hilton. Had Defendant Hilton enforced the policies and procedures they enacted to prevent trafficking from occurring within their Hilton branded hotels after observing an obvious sign of trafficking as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Hilton. Furthermore, had MK LCP Rye LLC properly followed the franchise policies enacted by Hilton to identify and prevent trafficking from occurring at Hilton branded hotels as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Hilton.

54.     Despite obvious signs of human trafficking and indicators of commercial sex activity, Hilton Defendants failed to recognize, stop, or report the venture occurring on the premise that resulted in K.S.'s trafficking and consequently, actively facilitated the trafficking venture. The Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, benefited, financial and otherwise, from the sex trafficking the Plaintiff suffered. Furthermore, the Defendants failed to prevent her continued victimization.

14

55.     Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject Hilton, despite the obvious signs of sex trafficking and commercial sex taking place there because said Defendants were actively engaged in facilitation of and benefiting from said activities.

**Franchisee Defendants Were Required to Report to the Franchisor Defendants**

56.     The relationships between Franchisee Defendants and Franchisor Defendants were governed by franchise agreements.

57.     At all material times, Franchisor Defendants had robust reporting requirements in place for its franchisees, such as Franchisee Defendants.

58.     Franchisor Defendants require its franchisees, such as Franchisee Defendants, to report all suspected instances of crime at their properties.

59.     Based on information observed by the staff, reports should have been made to Franchisor Defendants about the sex trafficking of K.S.

60.     Franchisor Defendants exercised pervasive and systematic control over Franchisee Defendants.

61.     Franchisor Defendants exercised an ongoing and systemic right of control over Franchisee Defendants.

62.     At all relevant times, Franchisee Defendants were subject to and required to comply with franchise agreement standards, policies, and rules adopted by Franchisor Defendants. These standards and policies are detailed and control the specific manner and means by which Franchisee Defendants must operate the hotels.

63.     Franchisor Defendants requires its franchisees, such as Franchisee Defendants, to report all suspected instances of sex trafficking at their properties.

64.    Franchisor Defendants required its franchisees, such as Franchisee Defendants, to allow Franchisor Defendants to regularly inspect its hotels.

65.    Franchisor Defendants regularly inspected the Franchisee Defendants.

66.    Franchisor Defendants required Franchisee Defendants to adhere to strict requirements, including but not limited to:

- standardized training methods for employees;

- building and maintaining the hotels in a manner specified by Franchisor Defendants;

- standardized or strict rules of operation for the hotels;

- regular inspection of the hotels and its operation by Franchisor Defendants;

- prices fixed by Franchisor Defendants;

- Franchisor Defendants provided online booking platforms;

- Franchisor Defendants established reporting requirements for the hotels; and

- other actions that deprived Franchisee Defendants of independence in the business operations.

67.    Franchisor Defendants specifically retained control over the day-to-day operation of Franchisee Defendants with regard to aspects of operation of the hotels that caused K.S.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education polices, and procedure regarding human trafficking.

68.    Franchisor Defendants regularly advised Franchisee Defendants on operational changes necessary for it to remain in compliance with Franchisor Defendants' strict regulations.

69.    Franchisor Defendants had the ability to impose fees or fines on Franchisee Defendants. Furthermore, at all material times, Franchisor Defendants retained an absolute right

16

to cancel its franchise agreement with Franchisee Defendants if Franchisor Defendants' rules were violated or if Franchisee Defendants otherwise failed to comply with its contractual obligations.

70.     At all relevant times, Franchisee Defendants acted as the agent of Franchisor Defendants.

71.     Franchisor Defendants and Franchisee Defendants shared control of the terms and conditions of the employment of staff and, therefore, Franchisor Defendants and Franchisee Defendants are joint employers. Upon information and belief, Franchisor Defendants exercised control over the terms and conditions employment of staff at the hotels at issue.

72.     Therefore, as a result of the strict reporting requirements, at all material times, each and every Defendant knew or should have known of their facilitation of sex trafficking at the subject hotels, including the facilitation of the sex trafficking of K.S.

**K.S.'s Trafficking Could Have Been Prevented**

73.     At all material times, each and every Defendant owned, operated, managed, supervised, controlled, and/or was responsible for the operations of the subject hotels.

74.     Defendants acted jointly to rent rooms at the subject hotels, with Franchisor Defendants retaining control over reservation systems and policies, training, and protocols as further described in this Complaint.

75.     Defendants were jointly responsible for customer safety and, specifically, prevention of human trafficking at the hotels. Franchisor Defendants retained control over, and thus had a duty with respect to, customer safety at the hotels generally and specifically regarding detection of and response to human trafficking at the hotels.

76.     Armed with knowledge of the prevalence of trafficking in the hotel industry, at hotels across the country, and the signs present at the subject hotels, each and every Defendant had

an obligation to enact, implement, follow, and enforce policies to identify sex trafficking and not to participate in or benefit from the facilitation thereof. Each and every Defendant failed to do so and thus facilitated sex trafficking that operated out of the hotels.

77.     The most effective weapon against sexual exploitation and human trafficking is education and training.[20] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[21]

78.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[22] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

79.     If the Defendants had adequately trained and implemented guidelines, "red flags," training policies and procedures, and other recommendations adopted in the industry, each and every Defendant would have or should have known of K.S.'s trafficking and would have been in a position to prevent the trafficking of K.S.

---

[20] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[21] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[22] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

80.     The "red flags" and signs of a sex trafficking venture described above were observed by Franchisee Defendants. Upon information and belief, Franchisee Defendants should have reported the signs of sex trafficking to Franchisor Defendants.

81.     Had each and every Defendant educated and/or trained their actual or apparent agents, servants, franchisees, employees and/or staff regarding human trafficking and their warning signs, their actual or apparent agents, servants, franchisees, employees and/or staff would have more aware of human trafficking taking place at their hotels and could have, at best, prevented it from happening or, at worst, been more willing to report it when it happened.

82.     Each and every Defendant's active decision not to prevent and stop sex trafficking and sexual exploitation at their hotels makes them accountable to victims of sex trafficking, including the Plaintiff K.S.

83.     Thus, each and every Defendant engaged in acts and omissions that supported, facilitated, harbored, and otherwise furthered the trafficker's sale and victimization of K.S. for commercial sexual exploitation. More specifically, the Defendants rented rooms to K.S.'s trafficker, permitted their illicit enterprise to operate on an ongoing and repetitious basis, and took no action to abide by Franchisor Defendants' own self-imposed anti-trafficking measures. This and related behavior by Defendants provide an ample basis to conclude that they participated in the venture that trafficked K.S.

84.     The motivation behind each and every Defendant's ongoing willful blindness and ongoing failure to act is plain and simple – limitless corporate greed; each and every Defendant ignored all of the signs of and/or solutions to human trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

**Each Defendant Knowingly Benefitted from K.S.'s Sex Trafficking**

85.     Plaintiff alleges that each of the Defendants knowingly received benefits from participating in the venture that facilitated K.S.'s trafficking.

86.     As a result of the strict reporting requirements at all material times, both Defendants knew they were facilitating and benefitting from sex trafficking at the hotels including the sex trafficking of K.S.

87.     Franchisor Defendants generate substantial income from operations of hotels. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, Franchisor Defendants received a share of the profits from room rentals collected by Franchisee Defendants. The primary source of Franchisor Defendants' income is the franchising royalty fee, but Franchisor Defendants also profits from reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees, as described in the franchise documents. The fees generated by Franchisor Defendants are primarily based on gross room rentals; therefore, Franchisor Defendants' profits increase with each room rental.

88.     Franchisee Defendants, as franchisees, profited from every stay by every patron at their hotels, both from room rentals and other hotel services.

89.     Upon information and belief, Franchisor Defendants knowingly benefitted from its participation in the sex trafficking venture carried on at the hotels in that it received a portion of the proceeds collected by its franchisee.

90.     Therefore, at all material times, Franchisor Defendants and Franchisee Defendants received monetary payment for the rental of rooms at the hotels, including the rooms where K.S. was being trafficked.

91.     Despite knowledge of the sex trafficking venture occurring, both Franchisee Defendants and Franchisor Defendants continued to financially benefit from K.S.'s stay, all while

doing nothing to prevent or stop criminal activity-sex trafficking, including the trafficking of K.S., from occurring on their property.

92.     As a result of the monies paid by K.S.'s trafficker to the secure rooms for her trafficking, Franchisor Defendants and Franchisee Defendants knowingly benefitted from participating in the venture that trafficked, harbored, and maintained K.S.'s trafficking.

**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

93.     K.S. incorporates all other allegations.

94.     At all relevant times, K.S. was and is a victim within the meaning of 18 U.S.C. § 1591 and 1595(a).

95.     Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above:

- Each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of K.S.; and

- Each Defendant knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

96.     Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, each and every Defendant knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, *et seq*.

97.     Despite knowledge of K.S.'s sex trafficking by the Defendants, K.S.'s trafficker was able to continue renting rooms for the sexual exploitation of K.S.

98.     Each Defendant participated in a venture together and with, among others, K.S.'s trafficker. Despite the fact that Defendants knew or should have known that K.S. was being sex trafficked in violation of the TVPRA, K.S.'s trafficker was able to continue renting rooms for the sexual exploitation of K.S. K.S.'s sex trafficker frequently used the hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while K.S. 's trafficker was able to rent a secure venue to earn profits by trafficking K.S. Each Defendant participated in the venture by continually renting rooms to K.S.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of K.S.'s trafficking.

99.     Each Defendant's failure to train and supervise their agents and employees and their inattention to the plights of their patrons, including K.S., enabled and contributed to the sex trafficking of K.S.

100.     Each Defendant received substantial financial benefits as a result of these acts and/or omissions. Franchisor Defendants received benefits in the way of management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the hotels. Franchisee Defendants received benefits in the way of room rental fees, in-room purchases, and other ancillary expenses by patrons and visitors of the hotels.

101.    The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

102.    Each Defendant's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to K.S.

103.    K.S. further alleges that, as a result of the relationship between Franchisor Defendants and Franchisee Defendants, Franchisor Defendants are vicariously liable for the acts of Franchisee Defendants. Factors that support this allegation are that Franchisor Defendants shared profits, standardized employee training, standardized and strict rules of operations, controlled pricing and reservations, regularly conducted inspections, provided operational support and control, and other acts described above. Finally, Franchisor Defendants had the right to terminate any franchisee, including Franchisee Defendants, that failed to comply with the requirements promulgated by Franchisor Defendants. Thus, Franchisor Defendants retained control, or the right to control, the mode and manner of work contracted for.

104.    K.S. further alleges that Franchisor Defendants are vicariously liable for the acts and omissions of the staff because Franchisor Defendants, together with Franchisee Defendants, act as the joint employer of these employees because Franchisor Defendants and Franchisee Defendants jointly control the terms and conditions of their employment.

## DAMAGES

105.    Franchisor Defendants and Franchisee Defendants' acts and omissions, individually and collectively, caused K.S. to sustain legal damages.

106.    Franchisor Defendants and Franchisee Defendants are joint and severally liable for all past and future damages sustained by K.S.

107.   K.S. is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages;

    b.  Direct damages;

    c.  Incidental and consequential damages;

    d.  Mental anguish and emotional distress damages (until trial and in the future);

    e.  Lost earning capacity in the future;

    f.  Loss of self-esteem and self-worth;

    g.  Necessary medical expenses;

    h.  Physical pain and suffering;

    i.  Physical impairment;

    j.  Emotional impairment;

    k.  Unjust enrichment; and

    l.  Penalties.

108.   K.S. is entitled to exemplary damages.

109.   K.S. is entitled to treble damages.

110.   K.S. is entitled to recover attorneys' fees and costs of court.

111.   K.S. is entitled to pre- and post-judgment interest at the maximum legal rates.

112.   A constructive trust should be imposed on Franchisor Defendants and Franchisee Defendants, and the Court should sequester any benefits or money wrongfully received by Franchisor Defendants or Franchisee Defendants for the benefit of K.S.

## DISCOVERY RULE

To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed.

## DEMAND FOR JURY TRIAL

113.    K.S. demands a jury trial on all issues.

## RELIEF SOUGHT

114.    Wherefore, K.S. respectfully requests judgment against Franchisor Defendants and Franchisee Defendants, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Dated: May 15, 2023                    Respectfully submitted,

**LOCKS LAW FIRM PLLC**

JANET WALSH
jwalsh@lockslaw.com
622 Third Avenue, 7th Floor
New York NY 10017
Phone: 212-838-3333

*Pro hac vice* motions to be filed:

**PROVOST ★ UMPHREY LAW FIRM**

MATTHEW MATHENY
mmatheny@pulf.com
CHRIS KIRCHMER
ckirchmer@pulf.com
FABIANA BAUM
fbaum@pulf.com

350 Pine Street, Ste. 1100
Beaumont, TX 77701
Phone:  409/838-8881

**ANNIE MCADAMS, PC**

ANNIE MCADAMS
1150 Bissonnet
Houston, TX 77005
Phone:  713/785-6262
Fax:  866/713-6141
annie@mcadamspc.com