| | |
|---|---|
| JANE DOE (K.S.),<br>                    Plaintiff<br>v.<br><br>BRISAM CLINTON LLC D/B/A COMFORT INN,<br>CAVALIER MERGERSUB LP F/K/A COREPOINT LODGING, INC.,<br>CHOICE HOTELS INTERNATIONAL INC. D/B/A COMFORT INN,<br>CPLG PRIME MEZZ L.L.C. F/K/A BRE/PRIME MEZZ LLC D/B/A LA QUINTA INN AND SUITES,<br>HILTON MANAGEMENT LLC D/B/A HILTON,<br>LA QUINTA FRANCHISING, LLC,<br>LA QUINTA HOLDINGS INC.,<br>LQ MANAGEMENT L.L.C,<br>MK LCP RYE LLC D/B/A HILTON, and<br>WYNDHAM HOTELS & RESORTS, LLC D/B/A LA QUINTA INN & SUITES,<br><br>                    Defendants | CIVIL ACTION NO: 1:23-cv-04032<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

COMES NOW Plaintiff Jane Doe (K.S.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**SUMMARY**

1. As sex trafficking has grown to epidemic proportions, it has become widely recognized that we must look beyond just the pimp and sex buyer to stop sex trafficking. We must look to the other individuals and entities who facilitate and benefit from sex trafficking.

2. The facilitation of sex trafficking is unlawful under federal law. The Trafficking Victims Protection Reauthorization Act ("TRVPA"), 18 U.S.C. § 1581, *et seq*, expands trafficking liability beyond the sex seller and buyer to also prohibit individuals or entities from knowingly

1

benefiting or attempting to benefit "financially or by receiving anything of value from participation in a venture which that person knew or should have known" was engaged in trafficking.

3. As discussed herein, each of the defendants in this case knowingly benefitted from participation in a venture that facilitated trafficking and ultimately, K.S.'s trafficking. Accordingly, K.S. brings suit under the TVPRA.

## JURISDICTION & VENUE

4. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

6. K.S. was trafficked in this District and Division.

## PARTIES

7. K.S. is a natural person who is currently a resident and citizen of Florida.

### I. New York Comfort Inn Defendants

8. Defendant Brisam Clinton LLC d/b/a Comfort Inn ("Brisam Clinton") is incorporated under the laws of the State of New York and has its principal place of business at 343 W 44th St, New York, NY 10036. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the Comfort Inn located at 343 W 44th St, New York, NY 10036 (hereinafter "New York Comfort Inn") pursuant to a franchising agreement through the Choice franchising system.

9. Defendant Choice Hotels International, Inc. d/b/a Comfort Inn ("Choice") is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York. It has its principal place of business at 1 Choice Hotels Circle, Suite 400, Rockville,

Maryland 20850 and can be served through its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207. Upon information and belief, at all relevant times it owned, operated, controlled, and/or managed the New York Comfort Inn through the Choice franchising system.

10. Brisam Clinton LLC and Choice are collectively referred to herein as the "Comfort Inn Defendants."

## II. Elmsford La Quinta Defendants

11. Defendant LQ Management L.L.C ("LQ Management") is incorporated under the laws of the State of Delaware Corporation and is registered to do business in the State of New York. It can be served through its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Ste. 104, Wilmington, DE 19810. Upon information and belief, at all relevant times they owned, operated, controlled, and/or managed the La Quinta Inn & Suites located at 540 Saw Mill Rd, Elmsford, NY 10523 ("Elmsford La Quinta").

12. Defendant La Quinta Franchising LLC ("LQ Franchising") is incorporated under the laws of the State of Nevada and is registered to do business in the State of New York. It can be served through its registered agent Corporate Creations Network, Inc., 8275 South Eastern Avenue #200, Las Vegas, NV, 89123. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Elmsford La Quinta.

13. Defendant CPLG Prime MEZZ L.L.C. f/k/a BRE/Prime Mezz LLC d/b/a La Quinta Inn and Suites is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York. It can be served through its registered agent Cogency Global, Inc., 122 E 42nd Street, 18th Floor, New York, NY 10168. Defendant Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc. is incorporated under the laws of the State of Delaware as a limited

partnership and is doing business in the State of New York. It can be served through its registered agent Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904. These two Defendants are referred to collectively herein as the "BRE Defendants."

a. In 2006, the Blackstone Group acquired the La Quinta brand through a merger between predecessor La Quinta entities and affiliates of the Blackstone Group.[1]

b. At the time of K.S.'s trafficking, the registered owner of the Elmsford La Quinta was BRE/Prime Mezz LLC.

c. Upon information and belief, at the time of its formation, BRE/Prime Mezz LLC was a wholly owned subsidiary of the Blackstone Group, which was also the parent company of the La Quinta entities.

d. At some time in 2013, prior to becoming a publicly traded company, La Quinta Holdings, Inc., acquired BRE/Prime Mezz LLC. [2]

e. In January of 2017, La Quinta Holdings, Inc., together with its consolidated subsidiaries, announced its intention to separate its real estate business from its franchise and management business, including the spin-off of its real estate ownership business into an independent publicly traded company.  The real estate spin-off was CorePoint Lodging, Inc., with its wholly-owned subsidiary CPLG Prime MEZZ L.L.C.  becoming the successor entity to BRE/Prime Mezz LLC.

f. Defendant Cavalier MergerSub LP later became the successor entity to CorePoint Lodging, Inc. as the result of a merger.[3]

g. Upon information and belief, CPLG Prime Mezz LLC and Cavalier MergerSub LP are responsible, as successors, for the acts and omissions of BRE/Prime Mezz LLC regarding the Elmsford La Quinta during K.S.'s trafficking. All references in this complaint to "BRE Defendants" include these Defendants in their capacity as successor entities.

14. Defendant La Quinta Holdings Inc. ("LQ Holdings") is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York. It can be served through its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Tattnall

---

[1] https://www.blackstone.com/news/press/the-blackstone-group-completes-acquisition-of-la-quinta/
[2] https://www.annualreports.com/HostedData/AnnualReportArchive/l/NYSE_LQ_2016.pdf ("On April 14, 2014, we acquired BRE/Prime Mezz L.L.C. and BRE/Wellesley Properties L.L.C., which owned the Previously Managed Hotels….")
[3] https://www.sec.gov/Archives/edgar/data/1707178/000119312522063995/d312375d8k.htm

Building Suite 104, Wilmington, DE 19810.  At relevant times, it was an "owner, operator, and franchisor of select-service hotels . . . under the La Quinta brand."[4]

    a. Upon information and belief, through a 2013 corporate reorganization, LQ Holdings acquired the assets and liabilities of predecessor La Quinta entities that had previously owned, operated, managed, and controlled the Elmsford La Quinta.[5] LQ Holdings is responsible for the wrongful acts of the predecessor LQ entities (and their agents and alter-egos) that operated, managed, and controlled the Elmsford La Quinta prior to this reorganization. All references to LQ Holdings include any predecessor LQ entities.

    b. Upon information and belief, at all relevant times LQ Management and LQ Franchising were wholly owned subsidiaries of LQ Holdings or predecessor entities for which LQ Holdings is the successor. LQ Management and LQ Franchising were subject to the control of LQ Holdings.

    c. Following this reorganization, LQ Holdings—together with the wholly owned subsidiaries which are its agents or alter-egos—owned, operated, and managed the Elmsford La Quinta until 2018 when Defendant Wyndham Hotels & Resorts, LLC d/b/a La Quinta Inn & Suites acquired the management and franchising businesses of LQ Holdings.

    d. Moreover, on information and belief, LQ Holdings is also a successor in interest to some portion of the assets and liabilities of the BRE Defendants.[6] LQ Holdings is responsible for the wrongful acts of the BRE Defendants.

15. Defendant Wyndham Hotels & Resorts, LLC d/b/a La Quinta Inn & Suites ("Wyndham") is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York.  It can be served through its registered agent Corporate Creations Network Inc, 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

    a. Upon information and belief, in 2018 Wyndham purchased La Quinta's management and franchise businesses, including interest in numerous hotels in the state of New York.

---

[4] https://www.annualreports.com/HostedData/AnnualReportArchive/l/NYSE_LQ_2016.pdf
[5] https://www.sec.gov/Archives/edgar/data/1594617/000119312515104620/d859384d424b4.htm
[6] Based on La Quinta Holdings Inc's 2014 Form 10-K filing with the Securities and Exchange Commission wherein La Quinta Holdings Inc reported, "On April 14, 2014, we acquired BRE/Prime Mezz L.L.C. and BRE/Wellesley Properties L.L.C., which owned the Previously Managed Hotels…."

b. Upon information and belief, Wyndham is the successor in interest to LQ Holdings and other predecessor LQ entities with respect to the operation of the Elmsford La Quinta. Wyndham is responsible for the wrongful acts of the predecessor LQ entities (and their agents and alter-egos) that operated, managed, and controlled the Elmsford La Quinta. All references to Wyndham include any predecessor entities.

16. BRE Defendants, LQ Holdings, LQ Management, LQ Franchising, and Wyndham are referred to collectively herein as the "LQ Defendants."

### III. New York Hilton Defendants

17. Defendant MK LCP Rye LLC d/b/a Hilton is incorporated under the laws of the State of Delaware and is registered to do business in the State of New York. It can be served through its registered agent C/O Mount Kellet Capital Management LP Attn: Michelle Chen, 623 Fifth Avenue, 18th Floor, New York, NY 10022. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Hilton located at 699 Westchester Ave, Rye Brook, NY 10573 (hereinafter "Rye Brook Hilton").

18. Defendant Hilton Management LLC d/b/a Hilton is incorporated under the laws of the State of New York and can be served through its registered agent Corporation Service Company, 80 State Street, Albany, NY 12207 (hereinafter "Hilton"). Upon information and belief, at all relevant times, Hilton owned, operated, controlled, and/or managed the Rye Brook Hilton.

19. MK LCP Rye LLC and Hilton are collectively referred to as the "Rye Brook Hilton Defendants."

### FACTS

20. K.S. is a victim of unlawful sex trafficking under 18 U.S.C. §1591.

21. K.S.'s trafficker caused her, using force, fraud, and/or coercion, to engage in commercial sex acts at hotels owned, operated, managed, and controlled by the Defendants.

22.     K.S.'s trafficker was a dangerous individual, with a well-established history of violence, who used force and threats of force, as well as other methods of coercion, to conduct the trafficking operation and gain compliance from his victims.

## I.     The Hotel Industry's Role in Sex Trafficking

23.     What Defendants knew or should have known about the sex trafficking that was occurring in their jointly operated hotel, including the trafficking of K.S., is shaped by the widely known and pervasive relationship between the hotel industry and sex trafficking.

24.     Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking, both directly and indirectly, from sex trafficking that occurs at their properties. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[7] For years, sex traffickers hav e "been able to reap these profits with little risk when attempting to operate within hotels."[8] In 2014, 92% of calls received b y the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[9] Hotels have been found to account for over 90% of commercial exploitation of children.[10]

---

[7] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[8] *See Human Trafficking in the Hotel Industry*, Polaris Project ( Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[10] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

25.     To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

26.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[12]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

---

[11] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[12] *See Id.*

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

27. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of those hotels.

28. The most effective weapon against sexual exploitation and human trafficking is education and training.[13] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

29. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel

---

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

30.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

31.     Defendants' statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

     a. Choice's Board of Directors has been discussing human trafficking issues since at least 2008 when it adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.[16]

     b. Choice claims that it started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010.[17] Upon information and belief, prior to K.S.'s trafficking period, Choice had reviewed and was familiar with Polaris publications regarding the hospitality industry, which include detailed recommendations for how hotels can respond to trafficking.

---

[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).
[16] https://www.choicehotels.com/about/responsibility/human-rights-policy
[17] https://www.choicehotels.com/about/responsibility/human-rights-policy

c. In November 2010, Defendant Choice publicly claimed it was partnering with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[21]

d. Prior to K.S.'s trafficking period, Hilton had publicly stated "Sex trafficking and sexual tourism is a large and growing problem worldwide, and Hilton Worldwide must never allow any of its properties, products, or services to be used in any manner that supports or enables any form of abuse and exploitation."[18]

e. Upon information and belief, prior to K.S.'s trafficking period, the LQ Defendants, Choice, and Hilton had each held internal meetings about sex trafficking, corresponded with external agencies and organizations about sex trafficking, and had received information showing the magnitude of the problem and the role of their branded hotels in facilitating it.

32. Defendants' actual knowledge was not limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before K.S.'s trafficking period, that sex trafficking was ongoing and widespread and its own hotel properties.

33. Choice, the LQ Defendants, and Hilton had the duty and assumed the responsibility to identify potential sex trafficking at their branded hotels.

34. Armed with the knowledge of the prevalence of trafficking in the hotel industry and at their own hotels, and the signs present at the subject hotels, each and every Defendant had an obligation to enact, implement, follow, and enforce policies to identify sex trafficking and not to participate in or benefit from the facilitation thereof. Each and every Defendant failed to do so and thus facilitated sex trafficking.

35. Each Defendant named herein had the opportunity and responsibility to adopt, implement, and enforce policies at their hotels to detect and stop facilitating sex trafficking.

---

[21] See Choice Hotels, Human Rights Policy, available at

https://www.choicehotels.com/about/responsibility/human-rights-policy; see also ECPAT-USA, Tourism Protection Code of Conduct, available at http://www.ecpatusa.org/code/
[18] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

Unfortunately for K.S., the promises made by the Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like K.S.

36.     The motivation behind each and every Defendant's willful blindness and ongoing failure to act is plain and simple – limitless corporate greed; each and every Defendant ignored all of the signs of and/or solutions to human trafficking out of unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

**II.     Sex Trafficking at the Elmsford La Quinta**

37.     One of the lives devalued and otherwise adversely affected by the LQ Defendants' facilitation of sex trafficking was K.S. On multiple occasions between July and September 2013, K.S. was repeatedly trafficked for sex at the Elmsford La Quinta.

*A. The La Quinta Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Elmsford La Quinta.*

38.     The use of La Quinta hotels for sex trafficking is well known to the La Quinta Defendants. Scores of news stories dating back as far as 2009, prior to K.S.'s trafficking, highlight the LQ Defendants' knowledge of such conduct. The LQ Defendants knew or should have known of the use of La Quinta-branded hotels for sex trafficking. Among other notable press involving the frequent use of La Quinta hotels for illegal activity, the following was reported:

- In 2009, an arrest was made at a La Quinta Inn in Cambridge where a man was forcing a woman into prostitution by threatening her with bodily harm.[19]

- In February 2013, police made arrests for a sex slavery ring running out of a La Quinta Inn near San Francisco International Airport.[20]

---

[19] https://www.metrowestdailynews.com/story/bulletin-tab/2009/07/01/former-state-rep-s-son/65129427007/
[20] https://www.huffpost.com/entry/south-san-francisco-sex-slavery_n_2734350

- In August 2013, a man was arrested and charged with trafficking offenses after dropping a 15-year-old girl at a La Quinta Inn in San Francisco.[21]

- In 2014, Raleigh police responded to the La Quinta Inn where a victim said she was forced into the commercial sex trade and discovered a family-run, multi-state sex trafficking ring that was operating at hotels.[22]

- In 2014, a 16-year-old trafficking victim was found by law enforcement with a 61-year-old man inside the La Quinta Inn in Tallahassee.[23]

- In 2013, a La Quinta Inn San Diego was sued by City Attorney's Office for its history of illegal activity. The hotel was "ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel…must now install more security cameras and signs to deter criminal activity. The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."[24]

39. These and other news stories show that the use of La Quinta hotels for sex trafficking was not isolated to one hotel or geographic area. The common use of La Quinta hotels for sex trafficking turned into a nationwide problem that stemmed from decisions at the top. The LQ Defendants knew that continuing the status quo would lead to more profits generated from sex trafficking.

40. Moreover, each of the LQ Defendants knew or should have known about widespread and ongoing sex trafficking at the Elmsford La Quinta specifically.

41. Each of the LQ Defendants knew or should have known that the Elmsford La Quinta was a high-risk zone for trafficking activity. New York State has the second-highest number of calls to the Human Trafficking Hotline, and Westchester County hotels are known to

---

[21] https://www.sfgate.com/crime/article/How-girls-fall-into-clutches-of-pimps-4705407.php
[22] https://www.wral.com/larceny-call-unveils-family-run-sex-trafficking-ring/14031981/
[23] https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/
[24] https://www.nbcsandiego.com/news/local/la-quinta-hotel-rancho-penasquitos-san-diego-paseo-montril/2050904/

be "hotspots" for trafficking.[25] Westchester County is known to be an area where sex traffickers relocate victims to make more money.[26] The New York FBI office has deemed Westchester hotels and motels hotspots for trafficking.[27] There were 1222 incidents of law enforcement being called to Westchester area hotels for prostitution or sex trafficking-related incidents in a three-year period.[28] The trafficking activity in this area was sufficiently well known and severe that it prompted New York to adopt legislation targeted at trafficking in the hospitality industry.[29]

42. The Elmsford La Quinta Inn property has been known as "Westchester's most chronic offender" for sex trafficking.[30]

43. Upon information and belief, the LQ Defendants monitored online reviews for the Elmsford La Quinta that provided them with actual knowledge of signs of sex trafficking at that hotel.[31] Upon information and belief, there were negative online reviews for the Elmsford La Quinta pre-dating the trafficking period that referenced criminal activity, including prostitution, and other indicia of sex trafficking, that have been removed from the internet.[32] Online reviews

---

[25] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438

[26] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438

[27] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438

[28] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438

[29] https://westchester.news12.com/turn-to-tara-report-on-sex-trafficking-in-new-york-motels-results-in-new-law

[30] *Id.*; https://hudsonvalley.news12.com/slavery-in-suburbia-officials-take-action-on-sex-trafficking-38219052

[31] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford

[32] *See, e.g.,* Complaint (ECF No. 1) in *A.D. v. Cavalier Mergersub LP, et al.* 2:22-cv-00649 (M.D. Florida) quoting a review as follows: "Regarding a January 2009 stay at a La Quinta Inn in Elmsford, New York, a customer wrote: "Also to make my trip exciting was the hooker that keeps going to the back door to meet her [trick]. Blondie has quit a business going on I smoke so I would go outside to have a [cigarette] and a few times I was approached by her trick and would have to tell him she was at the door waiting. It was very uncomfortable. Even my pregnant daughter was approached. By our third night a new hooker had come to stay." There is a review that corresponds to that date labeled "never again." https://web.archive.org/web/20100205031112/http://www.tripadvisor.com/Hotel_Review-g47685-d650465-Reviews-La_Quinta_Inn_Suites_Elmsford-Elmsford_New_York.html. However, this review has been removed and cannot be retrieved. https://www.tripadvisor.com/ShowUserReviews-g47685-d650465-r23347062-Baymont_by_Wyndham_White_Plains_Elmsford-Elmsford_New_York.html. On information and belief, discovery will uncover additional similar reviews.

further confirm that there was an embedded pattern of crime, including trafficking activity, even after K.S.'s trafficking. For example:

- April 28, 2014 Yelp review states "If you have money, don't be cheap and go somewhere that doesn't have prostitutes waiting by the back double doors."[33]

- November 1, 2017 Yelp review states "Crime hot spot. Police are here often. Drugs. Hookers. Good luck you'll need it. Overdose. Crazy people. Not sure if the staff cares or not."[34]

44.     Each of the LQ Defendants knew or should have known that law enforcement visited the Elmsford La Quinta on many occasions for issues related to prostitution and sex trafficking.[35]

45.     Traffickers repeatedly and intentionally chose to use the Elmsford La Quinta for their sex trafficking activity because they knew that members of the staff looked the other way and because of the access and security the hotel provided. When K.S. was being trafficked at the Elmsford La Quinta, there were other women who were also being trafficked at the same property.

46.     When K.S. was being trafficked at the Elmsford La Quinta, there were obvious signs of her trafficking. The rooms where she was trafficked were often paid for with cash. There was heavy foot traffic in and out of K.S.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed. In addition, there were other signs that K.S. was being trafficked, consistent with her trafficker's modus operandi, which matched the

---

[33] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford.
[34] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford
[35] *See, e.g.,* https://dailyvoice.com/new-york/greenburgh/police-fire/3-charged-with-prostitution-offenses-in-greenburgh/530766/

well-established "red flags" for trafficking that the LQ Defendants knew or should have known about.

47. The staff and management of the Elmsford La Quinta knew or were willfully blind to the fact that victims including K.S. were being trafficked. Yet, no one at the hotel notified law enforcement inquired about K.S.'s well-being or took any other steps in response to these recognized signs of sex trafficking. Instead, they continued associating with the traffickers by providing a venue where the trafficking activity could continue uninterrupted.

48. Upon information and belief, each of the LQ Defendants knew or should have known about this widespread trafficking at the Elmsford La Quinta, including the trafficking of K.S., based on:

a. observations of and knowledge of hotel staff and hotel management about the obvious signs of trafficking

b. obligation of hotel staff and hotel management to report suspected trafficking activity to the LQ Defendants

c. practice among the LQ Defendants of sharing knowledge and information about the operations of the Elmsford La Quinta, including information about suspected criminal activity

d. regular monitoring of online reviews

e. collection and monitoring of customer surveys and complaints

f. supervising the hotel property and staff

g. regular inspections of the hotel property

h. collection and review of surveillance of the hotel property

i. information provided by law enforcement; and

j. other sources of information available to the LQ Defendants.

49.     Each of the LQ Defendants knew or should have known about K.S.'s trafficking based on policies they adopted and purported to enforce that required hotel staff to report suspected trafficking activity to them.

50.     The LQ Defendants had constructive knowledge of the trafficking of K.S. because that trafficking was the direct result of the LQ Defendants facilitating widespread and ongoing trafficking at the Elmsford La Quinta.

B.  *The LQ Defendants facilitated sex trafficking at the Elmsford La Quinta, including the trafficking of K.S.*

51.     This widespread and ongoing sex trafficking at the Elmsford La Quinta, including the trafficking of K.S., was the result of each of the LQ Defendants—either directly or through the acts and omissions of their predecessor entities—facilitating sex trafficking at that hotel property.

52.     Despite and after having actual or constructive knowledge of widespread and ongoing sex trafficking at the Elmsford La Quinta, the LQ Defendants—acting individually and collectively—continued renting rooms to these traffickers, including the rooms used to sexually exploit K.S. In doing so, they formed an implicit agreement with the traffickers.

53.     The LQ Defendants further facilitated this widespread sex trafficking activity in ways including but not limited to the following:

a.  The LQ Defendants adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking at the Elmsford La Quinta.

b.  The LQ Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Elmsford La Quinta.

c.  The LQ Defendants had specific knowledge of policies that would stop or dramatically reduce sex trafficking at the Elmsford La Quinta and other branded properties (and reduce the accompanying revenue the LQ Defendants received from trafficking), but the LQ Defendants willfully chose not to adopt, implement, or enforce these policies.

d. The LQ Defendants deviated from and disregarded their own stated policies when operating the hotel.

e. The LQ Defendants attracted traffickers by affirmatively creating an attractive venue where risks of interference and traceability were low.

f. The LQ Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

g. The LQ Defendants allowed a high volume of unregistered guests, all going to the same room, to access the rooms where trafficking was occurring without logging these guests or taking any other appropriate steps.

h. The LQ Defendants chose not to report known or suspected trafficking activity appropriately according to reasonable practices, industry standards, and/or applicable policies.

i. Despite being aware of the widespread trafficking at the Elmsford La Quinta, each of the LQ Defendants facilitated this trafficking by continuing to operate the hotel in the same manner, which they knew or should have known would lead to additional sex trafficking in the hotel.

54. Traffickers, including K.S.'s, chose the Elmsford La Quinta because the traffickers knew that the policies and procedures adopted by the LQ Defendants would provide a desirable venue for their trafficking activities and that hotel staff would not interfere with but, instead, would facilitate their activities.

55. If the LQ Defendants had used reasonable diligence when operating the Elmsford La Quinta, they would have prevented the hotel from being used to facilitate widespread and ongoing sex trafficking. Instead, the LQ Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of K.S.

56. The LQ Defendants knew or were willfully blind to the fact that K.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate K.S.'s sexual exploitation.

57. The LQ Defendants did not act to reduce or eliminate the obvious and apparent sex trafficking at the Elmsford La Quinta because they were actively engaged in the facilitation of and were benefiting from said activities.

58. If the LQ Defendants had used reasonable diligence when working with one another and the hotel staff to operate the Elmsford La Quinta, they would have prevented the hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of K.S. Instead, the La Quinta Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of K.S.

59. Each of the LQ Defendants participated in the facilitation of sex trafficking described above. Each of the LQ Defendants participated in a hotel-operating venture that also included all staff of the Elmsford La Quinta, and each LQ Defendant participated directly in renting rooms to traffickers and facilitating trafficking at the Elmsford La Quinta:

   a. Upon information and belief, the Elmsford La Quinta was directly operated and managed by the LQ Defendants pursuant to agreements between the BRE Defendants, who owned the property, and LQ Holdings, LQ Management, and LQ Franchising. Upon information and belief, there was a management agreement and a franchising agreement between these parties. LQ Management acted as the management arm and LQ Franchising acted as the franchising arm for La Quinta. LQ Holdings was the sole owner and controlled both entities. The BRE Defendants owned the property, benefited from revenue earned at the hotel, and acted jointly with the other LQ entities to operate the hotel.

   b. Upon information and belief, this arrangement was part of a single unified operation by the LQ Defendants. Upon information and belief, all LQ Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, the LQ Defendants acted jointly to own, operate, control, manage, and supervise the Elmsford La Quinta. As an integrated enterprise and/or joint venture, the LQ Defendants, were separately and jointly responsible for compliance with all applicable laws.

   c. Upon information and belief, each of the LQ Defendants received a benefit when a room at the Elmsford La Quinta was rented to traffickers. Each defendant received a financial benefit in the form of increased revenue pursuant to the terms of the management and franchising agreements in addition to other benefits.

d. By participating in a venture that facilitated sex trafficking, each of the LQ Defendants benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

e. Upon information and belief, LQ Management, LQ Franchising, and LQ Holdings were jointly responsible for the development of all policies and training for the Elmsford La Quinta and for—together with BRE Defendants—performing and/or exercising control over day-to-day operations at the Elmsford La Quinta.

f. Upon information and belief, LQ Management, LQ Franchising, and LQ Holdings were the primary hotel operators of the Elmsford La Quinta during the time of K.S.'s trafficking.

g. Upon information and belief, LQ Management, LQ Franchising, and LQ Holdings provided and controlled the reservation system and were involved in the day-to-day operations of renting rooms at the hotel.

*C. Defendants' ventures at the Elmsford La Quinta*

60. Through the conduct described above, the LQ Defendants knowingly benefited from engaging in a venture with sex traffickers at the Elmsford La Quinta, including K.S.'s traffickers, as follows:

a. The LQ Defendants each received benefits, including but not limited to increased revenue, every time a room was rented to a trafficker at the Elmsford La Quinta.

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Elmsford La Quinta, which each of the LQ Defendants knew or should have known about.

c. The LQ Defendants associated with traffickers, including K.S.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. The LQ Defendants had a mutually beneficial relationship with the traffickers at the Elmsford La Quinta, fueled by the sexual exploitation of victims.

e. Sex traffickers, including K.S.'s traffickers, frequently used the Elmsford La Quinta for their trafficking because of an implicit understanding that the Elmsford La Quinta was a venue that would facilitate their trafficking, provide minimal interference and lower their risk of detection. This understanding occurred because of the conduct of the LQ Defendants facilitating that trafficking as described throughout this Complaint.

f. Each of the LQ Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. K.S.'s trafficking at the Elmsford La Quinta was a result of the LQ Defendants' participation in a venture with criminal traffickers. If the LQ Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from K.S.'s trafficking at the Elmsford La Quinta.

61. Through the conduct described above, each of the LQ Defendants also knowingly benefited from engaging in a venture with the Elmsford La Quinta hotel and its staff as follows:

a. Each of the LQ Defendants associated with the Elmsford La Quinta and its staff to operate the hotel.

b. Each LQ Defendant received financial benefits from operating the Elmsford La Quinta.

c. This venture violated 18 U.S.C. §1591(a) through the widespread sex trafficking and ongoing sex trafficking at the Elmsford La Quinta and through the actions of hotel staff.

d. Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), the LQ Defendants participated in the venture by continuing to associate with the hotel and its staff in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like K.S.

e. K.S.'s trafficking at the Elmsford La Quinta was a result of the LQ Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at the Elmsford La Quinta. Had the LQ Defendants not continued participating in a venture that they knew or should have known was engaged in violations of 18 U.S.C. §1591(a), they would not have received a benefit from K.S.'s trafficking at the Elmsford La Quinta.

D. *Defendants' vicarious liability*

62. All the LQ Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

63. Each of the LQ Defendants is responsible for the acts, omissions, and knowledge of all employees of the Elmsford La Quinta when operating the hotel because these acts and omissions were committed in the scope and course of employment or agency, because La Quinta Defendants ratified these acts and omissions, and because LQ Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific and known risks of human trafficking occurring in the Elmsford La Quinta.

64. LQ Holdings, LQ Management, LQ Franchising, and Wyndham are vicariously liable for the acts and omissions of BRE Defendants with regard to the operation of the Elmsford La Quinta because LQ Holdings, LQ Management, LQ Franchising, and Wyndham's predecessor entities exercised pervasive and systematic control over BRE Defendants and the hotel staff with respect to the operation of the Elmsford La Quinta.

65. Through the terms of the management and franchising agreements, policy and procedure, and other directives, LQ Holdings, LQ Management, LQ Franchising, and Wyndham's predecessor entities exercised control over the day-to-day operations of hotel operations, including the aspects of hotel operations that gave rise to K.S.'s lawsuit. These written standards, protocols, and requirements:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools used at the Elmsford La Quinta;

    b. covered virtually all aspects of hotel operations, including internal operating functions; and

    c. dictated the specific way that hotel staff must carry out most day-to-day functions at the Elmsford La Quinta; and

    d. significantly exceeded what was necessary for the LQ Defendants to protect registered trademarks.

66. An agency relationship was created and maintained through these Defendants' exercise of an ongoing and systemic right of control over operations, including the means and

methods of how that hotel conducts daily business, including hosting online bookings, setting parameters on employee wages, building and maintaining the facility in a manner specified, conducting regular inspection of the facility and operation, standardizing training methods for employees fixing prices for the property, providing an online reservation and booking tool, establishing detailed recordkeeping and reporting requirements, and other methods of exercising control over day-to-day operations at the hotel.

**III.    Sex Trafficking at the New York Comfort Inn**

67.    At various times in April and May 2013, K.S. was repeatedly trafficked for sex at the New York Comfort Inn.

*A. The Comfort Inn Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the New York Comfort Inn.*

68.    The use of Comfort Inn hotels for sex trafficking is well known to the Comfort Inn Defendants.

69.    Choice has known for years that pimps and traffickers use its hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Choice's knowledge of such conduct. Choice knew, or should have known, of the use of Comfort Inn branded hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put Choice Defendants on notice of the frequent use of Comfort Inn hotels including the subject Comfort Inn for commercial sex and other associated illegal activity. For example, on November 10, 2009, a young child was trafficked, raped, and killed at a Comfort Inn in Fayetteville, North Carolina. [36]   The incident caused such

---

[36] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in its hotels.[20]

70. Online reviews for Choice branded properties also demonstrate that Choice knew or should have known about signs of trafficking at its branded properties prior to K.S.'s trafficking:

- A review dating back to 2006 for a Choice property in Hicksville, NY reported hotel staff failing to respond appropriately to a customer report of potential criminal activity: "The walls were paper thin. This was a problem when our neighbors started fighting at 3 am. I woke up when he started slapping her. My boyfriend went to the reception desk and asked the clerk to call the police---instead the clerk called the room and asked the man to quiet down. Afterwards, we could still hear him "talking" and her crying. Finally, we had enough and requested a room change--that was handled promptly, and without any hassle. Again, I urged the clerk to call the police, but it was obvious that he did not want to get involved."[37]

- A 2006 review titled "prostitutes rampant" for a Choice property in Oakland, California reported "we checked into room 219 (in the back of the motel) only to find numerous prostitutes and apparent pimps in the parking lot and some of the first floor rooms. I felt it was a very very unsafe environment and we moved to another motel after only one half hour in the room."[38]

- A 2009 review from a Choice property in Jersey City, New Jersey stated "The only problem concerns the possible use of the rooms as a "short stay" type of place. The street is known for prostitution. During my most recent four night stay, two were quiet, one had screams at midnight from an amorous couple next door and one had a police visit to a nearby room due to a man claiming his "girlfriend" stole his wallet. I would urge the management to place these "short stay" types in a separate section of the motel."[39]

- A 2012 review of Choice Property in San Diego, California stated "My room was upstairs and I didn't sleep all night, people walked all night in the hallway. At 3:30 this INN is known for drug dealing and prostitutes....the next morning, there were two guys seating on the stairs - drinking beer...when I walked in the front desk to check-out, I told the front desk all of this incidents, his response was, "well, I can't

[20] See Change.org Petition, Tell Choice Hotels To Prevent Child Prostitution In Their Hotels, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels
[37] https://www.tripadvisor.com/Hotel_Review-g47890-d93215-Reviews-Econo_Lodge_Hicksville-Hicksville_Long_Island_New_York.html
[38] https://www.tripadvisor.com/Hotel_Review-g32810-d80444-Reviews-Quality_Inn_Oakland-Oakland_California.html
[39] https://www.tripadvisor.com/Hotel_Review-g46531-d589294-Reviews-Rodeway_Inn-Jersey_City_New_Jersey.html

control who stays in this INN". I think EXPEDIA needs to remove this listing from their website."[40]

71. Upon information and belief, Choice assumed responsibility to monitor online reviews, informed Brisam Clinton LLC about reviews, required Brisam Clinton LLC to respond to select reviews, and exercised control over the substance and form of these responses.

72. The news stories and reviews show that Choice knew that the use of Comfort Inn hotels for sex trafficking was not isolated to one location or geographic area and the common use of Comfort Inn hotels for sex trafficking had turned into a nationwide problem that stemmed from decisions at the top. Choice knew that continuing status quo operations would lead to more sex trafficking at Comfort Inn hotels.

73. The Comfort Inn Defendants knew or should have known that the New York Comfort Inn was a high-risk zone for trafficking activity. New York State has the second-highest number of calls to the Human Trafficking Hotline.[41] New York City is known to be a hot spot for trafficking activity.

74. Online reviews confirm there was a culture of crime, including trafficking activity, that persisted at the New York Comfort Inn even long after K.S. was trafficked there. For example, November 24, 2019, review stated: "I think there is some sort of prostitution situation happening at this hotel."[42]

75. The New York Comfort Inn staff, including management, knew or should have known about the sex trafficking pervasive at the New York Comfort Inn based on obvious indicators of this activity. Traffickers, including K.S.'s traffickers, repeatedly chose to use the New

---

[40] https://www.expedia.com/National-City-Hotels-Rodeway-Inn-National-City-San-Diego-South.h1787396.Hotel-Reviews

[41] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438

[42] https://www.expedia.com/New-York-Hotels-Comfort-Inn-Times-Square-West.h2774542.Hotel-Reviews.

York Comfort Inn for their sex trafficking activity and there were obvious and apparent signs of this widespread trafficking activity that hotel staff knew or should have known about before and during K.S.'s trafficking period.

76. When K.S. was being trafficked at the New York Comfort Inn, there were obvious signs of her trafficking, including but not limited to the following. There was heavy foot traffic in and out of K.S.'s room involving men who were not hotel guests. These men had to pass by the front desk to get to K.S.'s room. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed. In addition, there were other signs that K.S. was being trafficked, consistent with her trafficker's modus operandi, which matched the well-established "red flags" for trafficking that the Comfort Inn Defendants knew or should have known about.

77. The staff and management of the New York Comfort Inn knew or were willfully blind to the fact that victims including K.S. were being trafficked.

78. Upon information and belief, the Comfort Inn Defendants knew or should have known about widespread and ongoing trafficking activity at the New York Comfort Inn, including the trafficking of K.S., because of public information, including that referenced above, and because of non-public information available to the Comfort Inn Defendants through numerous channels including but not limited to the following:

   a. Brisam Clinton LLC's direct supervision and monitoring of the property at the New York Comfort Inn
   b. Brisam Clinton LLC's and Choice's collection and review of surveillance footage from the property at the New York Comfort Inn
   c. Choice's protocol that, on its face, required staff of the New York Comfort Inn and Brisam Clinton LLC to report suspected criminal activity and suspected trafficking to Choice
   d. Choice's regular, unannounced inspections of the New York Comfort Inn

e. Information obtained by Choice's "field-based associates" that visited hotels, including the New York Comfort Inn, to discuss human trafficking issues[43]

f. Brisam Clinton LLC's and Choice's joint involvement in soliciting, monitoring, analyzing, and responding to guest surveys and guest complaints

g. Choice's capture, retention, and analysis of extensive data about all aspects of the operation of the New York Comfort Inn

79. Choice knew or should have known about K.S.'s trafficking based on policies they adopted that required hotel staff and Brisam Clinton LLC to report suspected trafficking activity to them. The "red flags" and signs of a sex trafficking venture described above were observed by hotel staff. Upon information and belief, hotel staff and the franchisee should have reported the signs of sex trafficking to Choice.

80. The Comfort Inn Defendants had constructive knowledge of the trafficking of K.S. because that trafficking was the direct result of these Defendants facilitating widespread and ongoing trafficking at the New York Comfort Inn.

*B. Brisam Clinton LLC facilitated the trafficking activity at the New York Comfort Inn, including the trafficking of K.S*

81. Brisam Clinton LLC received a financial benefit, including but not limited to increased revenue, every time a room was rented by traffickers at the New York Comfort Inn.

82. Brisam Clinton LLC provided the "boots on the ground" for the operation of the New York Comfort Inn.

83. Brisam Clinton LLC is responsible for the acts, omissions, and knowledge of all employees of the New York Comfort Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment with Brisam Clinton LLC, because Brisam Clinton LLC ratified these acts and omissions, and because Brisam Clinton LLC

---

[43] https://www.choicehotels.com/about/responsibility/human-rights-policy

failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known Brisam Clinton LLC, of human trafficking occurring at the New York Comfort Inn.

84. Even though the hotel staff knew or was willfully blind to their trafficking activities, the hotel staff continued associating with sex traffickers, including K.S.'s trafficker, by renting them rooms and taking other steps to facilitate their trafficking activities. Despite and after having actual or constructive knowledge of widespread and ongoing sex trafficking at the New York Comfort Inn, Brisam Clinton LLC, continued directly participating in renting rooms to these traffickers. This created an implicit agreement between the hotel and the traffickers.

85. Brisam Clinton LLC knew or should have known that the way it was operating the New York Comfort Inn was leading to widespread sex trafficking but elected to continue operating the hotel in the same way, which it knew or should have known would lead to further sex trafficking at the hotel. Brisam Clinton LLC did this in ways including but not limited to failing to adequately train and supervise frontline staff, failing to follow written policies and directives regarding sex trafficking, affirmatively adopting practices that make the New York Comfort Inn a more attractive venue for sex trafficking, and otherwise implicitly providing support for the activities of sex traffickers.

86. Brisam Clinton LLC knew or should have known that K.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing hotel rooms and related services, to facilitate K.S.'s sexual exploitation.

87. If Brisam Clinton LLC had not facilitated activity that it knew or should have known was unlawful sex trafficking, then it would not have benefited from K.S.'s sex trafficking at the New York Comfort Inn.

*C. Choice facilitated sex trafficking at the New York Comfort Inn, including the trafficking of K.S.*

88.     Pursuant to the terms of the franchising agreement, Choice received a financial benefit, including but not limited to increased revenue, every time a room was rented by traffickers at the New York Comfort Inn. By participating in a venture that facilitated sex trafficking, Choice also benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

89.     Upon information and belief, Choice directly participated in renting rooms to traffickers at the New York Comfort Inn, including to K.S.'s traffickers, in ways including but not limited to the following:

    a. Choice controlled all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

    b. Choice directly took reservations for rooms at the New York Comfort Inn and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated. This CRS included a toll-free telephone reservation system, a proprietary internet site, mobile phone and tablet reservation applications, and interfaces with global distribution systems and other internet reservation sites.

    c. Choice could make reservations and take payment for rooms at the New York Comfort Inn without any involvement or approval by the franchisee.

    d. Choice directly entered into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels[44]

    e. When a guest did not make a reservation in advance through the CRS, Choice nonetheless controlled the specific process used to register a walk-in guest and generate a reservation for that guest.[45]

    f. Choice set or otherwise controlled room prices, required discounts, and reward programs. Choice also controlled the room rates offered to each guest.[46]

---

[44] https://www.sec.gov/Archives/edgar/data/1046311/000104631117000006/chh1231201610-k.htm
[45] https://www.choiceadvantage.com/cA_Functionality.pdf
[46] https://www.choiceadvantage.com/cA_Functionality.pdf

g. Choice controlled all data related to room rentals; every time someone makes a reservation, checks in, or checks out, the transaction goes directly through Choice's data center.[47]

h. Choice controlled and restricted the ability of Brisam Clinton LLC and hotel staff to refuse or cancel a reservation.

i. Choice established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the New York Comfort Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

j. Choice required Brisam Clinton LLC to use the ChoiceADVANTAGE property management system, which was owned, maintained, and controlled by Choice, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, Choice exercised control over day-to-day processes.

k. Choice maintained back-end access to the ChoiceADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the New York Comfort Inn.

l. Choice also participated in day-to-day operations regarding reservations by synchronizing the rate and inventory information for the New York Comfort Inn with the CRS and making day-to-day decisions about rates.

90. Choice continued renting rooms and providing related services to traffickers whom it knew or should have known were engaged in sex trafficking. In doing so, Choice formed an association in fact with the traffickers operating at the New York Comfort Inn who chose the hotel because the acts and willful or negligent omissions of Choice made it a favorable venue for sex trafficking.

91. Choice knew or should have known that K.S. was being trafficked and, despite this, benefited from continued association with her traffickers by providing hotel rooms and related services to facilitate K.S.'s sexual exploitation.

---

[47] https://www.raritan.com/resources/case-studies/detail/no-sleepless-nights-for-choice-hotels-data-center-team

92. Upon information and belief, Choice also participated directly in aspects of the operation of the New York Comfort Inn that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the following:

a. Choice retained control over and responsibility for training related to detecting and responding to human trafficking at the New York Comfort Inn.

b. Choice retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking at the New York Comfort Inn,

a. Choice was responsible for maintaining, monitoring, and analyzing patterns of criminal activity in franchised hotels including the New York Comfort Inn.

b. Choice assumed responsibility for distributing safety-related information to franchisees and hotel staff, including pushing information to the New York Comfort Inn through website and software portals that hotel management and staff were required to use when performing day-to-day job functions.

c. Choice assumed responsibility for monitoring circumstances and events associated with a high risk of trafficking and notifying franchisees and hotel staff of the same.[48]

c. Choice retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the New York Comfort Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

d. Choice collected, maintained, and analyzed detailed data regarding housekeeping services at the New York Comfort Inn, including trends that would reveal patterns consistent with human trafficking.

e. Choice maintained control over all aspects of internet services provided at the New York Comfort Inn, including whether it was provided, how it was provided, and detailed policies regarding guest use of that wi-fi, such as policies on blocking of sites and tracking or monitoring guest use of wi-fi for improper purposes, such as promoting the services of sex trafficking victims.

93. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the New York Comfort Inn, Choice continued participating in a

---

[48] https://www.choicehotels.com/about/responsibility/human-rights-policy

venture at that hotel, with its franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by:

a. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[21] However, Defendant Choice did not enforce the program, or require its employees to complete this training, or even follow up to make sure that Comfort Inn branded hotels were following the protocols.

b. Choice adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

c. Choice implicitly condoned and endorsed the franchisee's repeated decisions not to report or respond to trafficking appropriately.

d. Choice continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the New York Comfort Inn.

e. Choice deviated from and disregarded stated policies when operating the hotel.

f. Choice attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

g. Choice allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

h. Choice provided access to high volumes of unregistered guests all going into the same room without logging these guests or requiring identification.

i. Choice continued to allow the hotel to use its trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel.

j. Choice provided traffickers with access to internet services that Choice knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

k.

94. Choice and Brisam Clinton LLC did not act to reduce or eliminate the human sex trafficking at the New York Comfort Inn, despite the obvious signs of sex trafficking and

---

[21] See Choice Hotels, Human Rights Policy, available at https://www.choicehotels.com/about/responsibility/human-rights-policy; see also ECPAT-USA, Tourism Protection Code of Conduct, available at http://www.ecpatusa.org/code/

commercial sex taking place there, because said Defendants were actively engaged in the facilitation of and benefiting from said activities.

95. Traffickers, including K.S.'s, chose the New York Comfort Inn because the traffickers knew that the policies and procedures adopted by Choice would provide a desirable venue for their trafficking activities and that hotel staff would not interfere with but, instead, would facilitate their activities.

96. If Choice had used reasonable diligence when working with its franchisee and the hotel staff to operate the New York Comfort Inn, Choice would have prevented the New York Comfort Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of K.S. Instead, the Choice engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of K.S.

97. Had Choice enforced the policies and procedures they purportedly enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the New York Comfort Inn.

*D. Defendants' ventures at the New York Comfort Inn*

98. Through the conduct described above, Choice and Brisam Clinton LLC knowingly benefited from engaging in a venture with sex traffickers at the New York Comfort Inn, including K.S.'s traffickers, as follows:

 a. Choice and Brisam Clinton LLC both received benefits, including increased revenue, every time a room was rented at the New York Comfort Inn.

 b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the New York Comfort Inn, which Choice and Brisam Clinton LLC knew or should have known about.

c. Choice and Brisam Clinton LLC associated with traffickers, including K.S.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Choice and Brisam Clinton LLC had a mutually beneficial relationship with the traffickers at the New York Comfort Inn, fueled by sexual exploitation of victims.

e. Sex traffickers, including Jane Doe's traffickers, frequently used the New York Comfort Inn for their trafficking because of an implicit understanding that hotel was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Choice and Brisam Clinton LLC facilitating that trafficking as described throughout this Complaint.

f. Both Choice and Brisam Clinton LLC participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. K.S.'s trafficking at the New York Comfort Inn was a result of Choice and Brisam Clinton LLC's participation in a venture with criminal traffickers. If Choice and Brisam Clinton LLC had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from K.S.'s trafficking at the New York Comfort Inn.

99. Through the conduct described above, Choice also knowingly benefited from engaging in a venture with Brisam Clinton LLC operating the New York Comfort Inn as follows:

a. Choice associated with Brisam Clinton LLC to operate the New York Comfort Inn.

b. Pursuant to the terms of the franchising agreement, both Choice and Brisam Clinton LLC received financial benefits from operating the New York Comfort Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture violated 18 U.S.C. §1591(a) through the conduct of Brisam Clinton LLC and the widespread sex trafficking at the New York Comfort Inn.

d. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), Choice participated in the venture by continuing to associate with Brisam Clinton LLC to operate the New York Comfort Inn in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like K.S.

e. K.S.'s trafficking at the New York Comfort Inn was a result of Choice's and Brisam Clinton LLC's facilitation of the widespread and ongoing violations of 18 U.S.C.

34

§1591(a) at the New York Comfort Inn. Had Choice not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from K.S.'s trafficking at the New York Comfort Inn.

*E. Brisam Clinton LLC and the staff at the New York Comfort Inn acted as actual agents of Choice.*

100. Choice is vicariously liable for the acts, omissions, and knowledge of Brisam Clinton LLC and the staff at the New York Comfort Inn, which are Choice's actual agents or subagents.

101. Choice has ratified the acts and omission of Brisam Clinton LLC and staff at the New York Comfort Inn.

102. Choice subjected Brisam Clinton LLC to detailed standards and requirements regarding the operation of the New York Comfort Inn through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Choice. These written standards, protocols, and requirements:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Brisam Clinton LLC used at the New York Comfort Inn; and
   b. covered virtually all aspects of hotel operations, including internal operating functions; and
   c. dictated the specific manner in which Brisam Clinton LLC and hotel staff must carry out most day-to-day functions at the New York Comfort Inn; and
   d. significantly exceeded what was necessary for Choice to protect its registered trademarks.

103. In addition to the ways described above, upon information and belief, Choice exercised and reserved the right to exercise systemic and pervasive control over Brisam Clinton LLC 's day-to-day operation of the New York Comfort Inn in ways including but not limited to the following:

35

a. Choice required Brisam Clinton LLC and management of the New York Comfort Inn to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Choice to protect its trademarks.

b. Choice retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected.

c. Choice controlled the details of training conducted for hotel staff by Brisam Clinton LLC by requiring the use of standardized training methods and materials, including developing online, role-specific training that Brisam Clinton LLC was required to use.

d. Choice adopted detailed job descriptions for each position at the Comfort Inn and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

e. Choice set required staffing levels for the Comfort Inn

f. Choice exercised significant control over the procurement decisions of Brisam Clinton LLC by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors.

g. Choice imposed and enforced detailed requirements for all aspects of hotel facilities.

h. Choice controlled channels for guests to report complaints or provide feedback regarding the New York Comfort Inn and directly participated in the response and/or supervised and dictated Brisam Clinton LLC's response to customer complaints or other feedback.

i. Choice required the New York Comfort Inn to participate in a mandatory guest complaint resolution system operated, managed, and overseen by Choice.

j. Choice required Brisam Clinton LLC to join and participate in a franchisee association with other Choice brand hotels.

k. Choice controlled all marketing for the New York Comfort Inn, including all website pages, and prohibited Brisam Clinton LLC from using any website, social media, advertising, or other public communication without written approval from Choice.

l. Choice required Brisam Clinton LLC to refer all guests who it could not accommodate to other Choice-branded hotels.

m. Choice required Brisam Clinton LLC to purchase insurance and set specific requirements for that insurance.

n. Choice imposed detailed recordkeeping and reporting requirements on Brisam Clinton LLC regarding virtually all aspects of hotel operation.

o. Choice collected, monitored, and analyzed dozens of reports regarding the New York Comfort Inn through the backend of the ChoiceADVANTAGE property

management system and used these reports to supervise and control the day-to-day operations of the New York Comfort Inn.

p. Choice collected, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and our GIS (Guest Insight System) through the backend of the ChoiceADVANTAGE property management system and used this information to supervise, monitor, manage, and control the day-to-day operations of the New York Comfort Inn.

q. Choice retained the virtually unlimited right to supervise the day-to-day operations of the hotel by retaining the right to implement any automatic reporting systems it elected to use.

r. Choice retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

s. Choice retained the right to inspect the New York Comfort Inn, including through unannounced inspections.

t. Choice retained the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement, on Brisam Clinton LLC for violations of any rule, policy, or standard promulgated by Choice.

## IV. Sex Trafficking at the Rye Brook Hilton

104. At various times in April and May 2013, K.S. was repeatedly trafficked for sex at the Rye Brook Hilton.

*A. The Rye Brook Hilton Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Rye Brook Hilton*

105. The use Hilton branded hotels for sex trafficking is well known to Hilton Defendants and MK LCP Rye LLC.

106. The Rye Brook Hilton Defendants have known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct.[49] As early as 2010, Chinese police found a

---

[49] *Prostitution bust in Westchester Co.* (Oct. 8, 2009), https://abc7ny.com/archive/7055026/; St. John Barned-Smith, 'Pimp of the Pike' to serve more than 10 years for running prostitution ring, The Washington Post (May 8, 2013), https://www.washingtonpost.com/local/pimp-of-the-pike-to-serve-more-than-10-years-for-running-prostitution-ring/2013/05/08/3387a69c-b7e3-11e2-b94c-b684dda07add_story.html

brothel operating inside a Hilton hotel, which prompted Hilton officials to publicly claim to be working on a code of conduct to prevent child sex trafficking in its hotels.[50] Significantly, a prostitution bust involving the **exact same hotel** was done four years prior to K.S.'s trafficking.[51] Defendants knew or should have known, of the use of Hilton-branded hotels for sex trafficking ventures.

107. The Rye Brook Hilton Defendants knew or should have known that the Rye Brook Hilton was a high-risk zone for trafficking activity. New York State has the second-highest number of calls to the Human Trafficking Hotline.[52] Westchester County is known to be an area where sex traffickers relocate victims to make more money.[53] The New York FBI office has deemed Westchester hotels and motels hotspots for trafficking.[54] There were 1222 incidents of law enforcement being called to Westchester area hotels for prostitution or sex trafficking related incidents in a three-year period.[55] The trafficking activity in this area was sufficiently well known and severe that it prompted New York to adopt legislation targeted at trafficking in the hospitality industry.[56]

108. The staff at the Rye Brook Hilton also knew or should have known about the sex trafficking pervasive at the Rye Brook Hilton based on obvious indicators of this activity. Traffickers, including K.S.'s traffickers, repeatedly chose to use the Rye Brook Hilton for their

---

[50] https://www.nasdaq.com/articles/hilton-working-abolish-child-sex-trafficking-2010-11-03
[51] *Prostitution bust in Westchester Co.* (Oct. 8, 2009), https://abc7ny.com/archive/7055026/ ("They recruited, managed and scheduled nearly three dozen women sending them on calls to many Westchester hotels, including the Rye Town Hilton").
[52] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438
[53] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438
[54] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438
[55] https://westchester.news12.com/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley-38003438
[56] https://westchester.news12.com/turn-to-tara-report-on-sex-trafficking-in-new-york-motels-results-in-new-law

sex trafficking activity and there were obvious and apparent signs of this widespread trafficking activity that hotel staff knew or should have known about before K.S.'s trafficking period.

109. When K.S. was being trafficked at the Rye Brook Hilton, there were obvious signs of her trafficking, including but not limited to the following. There was heavy foot traffic in and out of K.S.'s room involving men who were not hotel guests. Housekeeping saw these men come in and out of the rooms. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed. Other girls were being trafficked at the same hotel at the same time as K.S., and K.S. always had to share a room with another girl. When K.S. was with an individual, the other girl would sit in the hotel lobby and wait and K.S. would do the same when the other girl was with someone. In addition, there were other signs that K.S. was being trafficked, consistent with her trafficker's modus operandi, which matched the well-established "red flags" for trafficking that the Rye Brook Hilton Defendants knew or should have known about.

110. The staff and management of the Rye Brook Hilton knew or were willfully blind to the fact that victims, including K.S., were being trafficked.

111. Upon information and belief, the Rye Brook Hilton Defendants knew or should have known about widespread and ongoing trafficking activity at the Rye Brook Hilton, including the trafficking of K.S., because of the public information outlined above and because of non-public information available to the Rye Brook Hilton Defendants through numerous channels including:

    a. MK LCP Rye LLC's direct supervision and monitoring of the property at the at the Rye Brook Hilton.

    b. MK LCP Rye LLC's and Hilton's collection and review of surveillance footage from the property at the Rye Brook Hilton.

    c. Hilton's protocol that, on its face, required staff of the Rye Brook Hilton and MK LCP Rye LLC to report suspected criminal activity and suspected trafficking to Hilton.

d. Hilton's regular, unannounced inspections of the Rye Brook Hilton.

e. MK LCP Rye LLC and Hilton's joint involvement in soliciting, monitoring, analyzing, and responding to guest surveys and guest complaints.

f. Hilton's capture, retention, and analysis of extensive data about all aspects of the operation of the Rye Brook Hilton.

g. Information obtained by Hilton's "field-based associates" that visit hotels to discuss human trafficking issues.

112. Hilton knew or should have known about K.S.'s trafficking based on policies they adopted that required hotel staff and MK LCP Rye LLC to report suspected trafficking activity to them. The "red flags" and signs of a sex trafficking venture described above were observed by hotel staff. Upon information and belief, hotel staff and the franchisee should have reported the signs of sex trafficking to Hilton.

113. The Rye Brook Hilton Defendants had constructive knowledge of the trafficking of K.S. because that trafficking was the direct result of these Defendants facilitating widespread and ongoing trafficking at the Rye Brook Hilton.

B. *MK LCP Rye LLC facilitated the trafficking activity at the Rye Brook Hilton, including the trafficking of K.S.*

114. MK LCP Rye LLC received a financial benefit, including but not limited to increased revenue, every time a room was rented by traffickers at the Rye Brook Hilton.

115. MK LCP Rye LLC provided the "boots on the ground" for operation of the Rye Brook Hilton.

116. MK LCP Rye LLC is responsible for the acts, omissions, and knowledge of all employees of the Rye Brook Hilton when operating the hotel because these acts and omissions were committed in the scope and course of employment, because MK LCP Rye LLC ratified these acts and omissions, and because MK LCP Rye LLC failed to exercise reasonable care with regard

to the hiring, training, and supervision of these employees given the specific risks, known to MK LCP Rye LLC, of human trafficking occurring at the Rye Brook Hilton.

117. Even though the hotel staff knew or was willfully blind to their trafficking activities, the Rye Brook Hilton staff continued associating with criminal traffickers, including K.S.'s trafficker, by renting them rooms and taking other steps to facilitate their trafficking activities without interference and with minimal risk of detection. This arrangement was an implicit agreement.

118. Despite and after having actual or constructive knowledge of widespread and ongoing sex trafficking at the Rye Brook Hilton, MK LCP Rye LLC, continued directly participating in renting rooms to these traffickers.

119. MK LCP Rye LLC knew or should have known that the way it was operating the Rye Brook Hilton was leading to widespread sex trafficking but elected to continue operating the hotel in the same way, which it knew or should have known would lead to further sex trafficking at the hotel. MK LCP Rye LLC did this in ways including but not limited to failing to adequately train and supervise frontline staff, failing to follow written policies and directives regarding sex trafficking, affirmatively adopting practices that make the Rye Brook Hilton a more attractive venue for sex trafficking, and otherwise implicitly providing support for the activities of sex traffickers.

120. MK LCP Rye LLC, knew should have known that K.S. was being trafficked and, despite this, benefited from continued association with her traffickers by directly participating in providing a venue in the form of hotel rooms and related services, to facilitate K.S.'s sexual exploitation.

121. If MK LCP Rye LLC had not facilitated activity that it knew or should have known was unlawful sex trafficking, then it would not have benefited from K.S.'s sex trafficking at the Rye Brook Hilton.

*C. Hilton facilitated sex trafficking at the Rye Brook Hilton, including the trafficking of K.S.*

122. Under the terms of the franchising agreement with MK LCP Rye LLC, Hilton received a financial benefit, including but not limited to increased revenue, every time a room was rented by traffickers at the Rye Brook Hilton.

123. Hilton directly participated in renting rooms to traffickers at the Rye Brook Hilton Inn, including to K.S.'s traffickers, in ways including but not limited to the following.

   a. Hilton controlled all details of the guest reservation, check-in, and payment processes through its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods used for each of these processes.

   b. Hilton directly made reservations for rooms at the Rye Brook Hilton and accepted payment for those rooms through a central reservation system that it controlled and operated. It could reserve rooms and accept payments without requiring franchisee approval or involvement.

   c. Hilton controlled room rates, required discounts, mandatory fees, and rewards programs.

   d. Hilton controlled and restricted the ability of MK LCP Rye LLC and hotel staff to refuse or cancel a reservation.

   e. Hilton collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Rye Brook Hilton, including the following categories of information: Name, Contact information (mailing address, email address, phone number), Nationality, Date of birth, Gender, Payment card information, Hilton Honors number, Passport information, Preferred language, Room preference, Room selection and assignment, Arrival Time, Additional guest names, Corporate travel planner contact information (name, title, company, business phone, email and address), Corporate number and name, Travel agent number and name, Airline partner number and name, Vehicle information, Images or footage captured by closed circuit television (CCTV), Internet or other electronic network activity information, including information regarding a customer's interaction with Hilton websites, applications, or advertisements, IP addresses, Session IDs, Booking engine, Whether a customer has a Hilton and American Express Co-Branded Credit Card, Whether a customer's Hilton and Amazon accounts are linked, Whether a

customer's Hilton and Lyft accounts are linked, Geolocation information, Device information, Social media information, Demographics data, a customer's usability preferences regarding Hilton's website (such as a customer's email preferences, MyWay preferences, and opt-out preferences), Description of a complaint that a customer makes to Hilton, including a customer's free form textual feedback if the customer is a Hilton Honors member, Customer ratings and survey responses, and Free form textual feedback.[57]

f. Hilton established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Rye Brook Hilton until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

g. Hilton required MK LCP Rye LLC to use Hilton's property management system, which was owned, maintained, controlled, and operated by Hilton, for virtually all aspects of hotel operations regarding room reservations and payment.

124. Hilton continued renting rooms and providing related services to traffickers whom it knew or should have known were engaged in sex trafficking.

125. Although Hilton knew or should have known that K.S. was being trafficked, it nonetheless benefited from continued association with her traffickers by providing hotel rooms and related services to facilitate K.S.'s sexual exploitation.

126. Upon information and belief, Hilton participated directly in aspects of the operation of the Rye Brook Hilton that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the following:

a. Hilton retained control over and responsibility for training related to detecting and responding to human trafficking at the Rye Brook Hilton.

b. Hilton retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking at the Rye Brook Hilton.

c. Hilton required hotel staff members to report suspected trafficking to Hilton through the Hilton Hotline.

---

[57] https://www.hilton.com/en/p/global-privacy-statement/

d. Hilton assumed the responsibility to alert specific hotels, including the Rye Brook Hilton, of circumstances, prompting a high risk for trafficking activity.

d. Hilton maintained, monitored, and analyzed patterns of criminal activity in franchised hotels, including the Rye Brook Hilton

e. Hilton assumed responsibility for guest safety by collecting and maintaining and images or footage from closed circuit television (CCTV) at hotel properties[58]

f. Hilton maintained control over all details of the terms under which franchised hotels, including the Rye Brook Hilton, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data.

g. Hilton retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Rye Brook Hilton, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

h. Hilton collected, maintained, and analyzed detailed data regarding housekeeping services at the Rye Brook Hilton, including trends that would reveal patterns consistent with human trafficking.

127. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Rye Brook Hilton, Hilton continued participating in a venture at that hotel, with its franchisee and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following.

a. While Hilton publicly committed to the EPCAT Code in 2011, it failed to take any significant steps to implement that commitment prior to K.S.'s trafficking.[59]

b. Hilton adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking.

---

[58] https://www.hilton.com/en/p/global-privacy-statement/#CollectionGenerally
[59] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2012;
https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

c. Hilton delayed implementation of anti-trafficking training. While Hilton committed to the EPCAT Code in 2011, it had completed no training in 2011 and 2012 and had only trained 879 individuals by the time of its 2013 report.[60]

d. Hilton implicitly condoned and endorsing its franchisee's repeated decisions not to report or respond to trafficking appropriately.

e. Hilton ignored policies that it had purportedly enacted and implemented.

f. Hilton continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Rye Brook Hilton.

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Rye Brook Hilton, Hilton declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits.

h. Hilton attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

i. Hilton allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j. Hilton continued to allow the hotel to use its trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel.

k. Hilton provided traffickers with access to internet services that Hilton knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

128. Rye Brook Hilton and MK LCP Rye LLC did not act to reduce or eliminate the human sex trafficking at the Rye Book Hilton, despite the obvious signs of sex trafficking and commercial sex taking place there, because said Defendants were actively engaged in facilitation of and benefiting from said activities.

129. Traffickers, including K.S.'s, chose the Rye Brook Hilton because the traffickers knew that the policies and procedures adopted by Hilton would provide a desirable venue for their trafficking activities and that hotel staff would not interfere with but, instead, would facilitate their activities.

---

[60] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

130. If Hilton had used reasonable diligence when working with its franchisee and the hotel staff to operate the Rye Brook Hilton, Hilton would have prevented the Rye Brook Hilton from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of K.S. Instead, Hilton engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of K.S.

131. Had Hilton enforced the policies and procedures they purportedly enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, K.S.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Rye Brook Hilton.

*D. Defendants' ventures at the Rye Brook Hilton*

132. Through the conduct described above, Hilton and MK LCP Rye LLC knowingly benefited from engaging in a venture with sex traffickers at the Rye Brook Hilton, including K.S.'s traffickers, as follows:

    a. Hilton and MK LCP Rye LLC both received benefits, including increased revenue, every time a room was rented at the Rye Brook Hilton.

    b. This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the Rye Brook Hilton, which Hilton and MK LCP Rye LLC knew or should have known about.

    c. Hilton and MK LCP Rye LLC associated with traffickers, including K.S.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

    d. Hilton and MK LCP Rye LLC had a mutually beneficial relationship with the traffickers at the Rye Brook Hilton, fueled by sexual exploitation of victims.

    e. Sex traffickers, including K.S.'s traffickers, frequently used the Rye Brook Hilton for their trafficking because of an implicit understanding that the hotel was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of

Hilton and MK LCP Rye LLC facilitating that trafficking as described throughout this Complaint.

f.  Both Hilton and MK LCP Rye LLC participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  K.S.'s trafficking at the Rye Brook Hilton was a result of Hilton and MK LCP Rye LLC's participation in a venture with criminal traffickers. If Hilton and MK LCP Rye LLC had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from K.S.'s trafficking at the Rye Brook Hilton.

133.  Through the conduct described above, Hilton also knowingly benefited from engaging in a venture with MK LCP Rye LLC operating the Rye Brook Hilton as follows:

a.  Hilton associated with MK LCP Rye LLC to operate the Rye Brook Hilton.

b.  Pursuant to the terms of the franchising agreement, both Hilton and MK LCP Rye LLC received financial benefits from operating the Rye Brook Hilton, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  This venture violated 18 U.S.C. §1591(a) through the conduct of MK LCP Rye LLC and the widespread sex trafficking at the Rye Brook Hilton.

d.  Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), Hilton participated in the venture by continuing to associate with MK LCP Rye LLC to operate the Rye Brook Hilton in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like K.S.

e.  K.S.'s trafficking at the Rye Brook Hilton was a result of Hilton's and [Franchisee 1]'s facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at the Rye Brook Hilton. Had Hilton not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from K.S.'s trafficking at the Rye Brook Hilton.

*E.  MK LCP Rye LLC and the staff at the Rye Brook Hilton acted as actual agents of Hilton.*

134.  Hilton is vicariously liable for the acts, omissions, and knowledge of MK LCP Rye LLC and staff at the Rye Brook Hilton, which are Hilton's actual agents or subagents.

135. Hilton has ratified the acts and omission of MK LCP Rye LLC and staff at the Rye Brook Hilton.

136. Hilton subjected MK LCP Rye LLC to detailed standards and requirements regarding the operation of the Rye Brook Hilton through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Hilton. These written standards, protocols, and requirements:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools MK LCP Rye LLC used at the New York Rye Brook Hilton;

b. covered virtually all aspects of hotel operations, including internal operating functions;

c. dictated the specific way MK LCP Rye LLC and hotel staff must carry out most day-to-day functions at the Rye Brook Hilton; and

d. significantly exceeded what was necessary for Hilton to protect its registered trademarks.

137. In addition to the ways described above, upon information and belief, Hilton exercised and reserved the right to exercise systemic and pervasive control over day-to-day operation of the Rye Brook Hilton in ways including but not limited to the following:

a. Hilton required MK LCP Rye LLC and management of the Rye Brook Hilton to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Hilton to protect its trademarks.

b. Hilton retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected.

c. Hilton controlled the details of training conducted for hotel staff by MK LCP Rye LLC by requiring the use of standardized training methods and materials.

d. Hilton provided day-to-day services through the back-end operation of the property management system used for virtually all aspects of running the Rye Brook Hilton.

48

e. Hilton adopted detailed job descriptions for each position at the Rye Brook Hilton and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

f. Hilton set required staffing levels for the Rye Brook Hilton.

g. Hilton imposed and enforced detailed requirements for all aspects of hotel facilities

h. Hilton required that MK LCP Rye LLC use Hilton's preferred vendors to purchase goods necessary for day-to-day operation of the hotel.

i. Hilton controlled channels for guests to report complaints or provide feedback regarding the Rye Brook Hilton and directly participated in the response and/or supervised and dictated MK LCP Rye LLC's response to customer complaints or other feedback.

j. Hilton required MK LCP Rye LLC to join and participate in a franchisee association with other Hilton brand hotels.

k. Hilton controlled all marketing for the Rye Brook Hilton.

l. Hilton required MK LCP Rye LLC to purchase insurance and set specific requirements for that insurance.

m. Hilton imposed detailed recordkeeping and reporting requirements on MK LCP Rye LLC regarding virtually all aspects of hotel operation

n. Hilton retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

o. Hilton retained the right to inspect the Rye Brook Hilton, including through unannounced inspections.

p. Hilton retained the right to impose penalties and ultimately to terminate the franchise agreement if MK LCP Rye LLC violated Hilton's standards, rules, regulations, or expectations.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

138. K.S. incorporates all other allegations.

139. At all relevant times, K.S. was and is a victim within the meaning of 18 U.S.C. § 1591 and 1595(a).

140. Each Defendant is liable as a perpetrator within the meaning of 18 U.S.C. § 1595(a) because in the ways described above:

- Each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of K.S.; and

- Each Defendant knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

141. Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, each and every Defendant knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, *et seq*.

142. Despite knowledge of K.S.'s sex trafficking by the Defendants, K.S.'s trafficker was able to continue renting rooms for the sexual exploitation of K.S.

143. Through acts and omissions described throughout this Complaint, each of the Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe's traffickers, despite the fact that each defendant knew or should have known that these traffickers, including K.S.'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each of the Defendants is liable as a beneficiary under 18 U.S.C §1595(a). Despite the fact that Defendants knew or should have known that K.S. was being sex trafficked in violation of the TVPRA, K.S.'s trafficker was able to continue renting rooms for the sexual exploitation of K.S. K.S.'s sex trafficker frequently used the hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers

shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while K.S. 's trafficker was able to rent a secure venue to earn profits by trafficking K.S. Each Defendant participated in the venture by continually renting rooms to K.S.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of K.S.'s trafficking.

144. Through the acts and omissions described throughout this Complaint, Choice, Hilton, and the La Quinta Defendants received a financial benefit from participating in a venture with their respective franchisees, hotels, and the staff of those hotels despite the fact that each of these Defendants knew or should have known the venture was violating 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2).

145. Each Defendant received substantial financial benefits as a result of these acts and/or omissions through management fees, royalty fees, reservation fees, marketing fees, room rental fees, in-room purchases, and other ancillary expenses by patrons and visitors of the hotels.

146. The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

147. The venture or ventures in which each Defendant participated were proximate causes of the injuries and damages to Jane Doe and were direct causes and/or substantial factors in causing those injuries and damages.

148. In addition to being independently liable, Choice is also vicariously liable for the acts, omissions, and knowledge of Brisam Clinton LLC based on the existence of an actual agency relationship.

51

149. In addition to being independently liable, Hilton is also vicariously liable for the acts, omissions, and knowledge of MK LCP Rye LLC based on the existence of an actual agency relationship.

150. In addition to being independently liable, LQ Holdings, LQ Management, and LQ Franchising are also vicariously liable for the acts, omissions, and knowledge of the BRE Defendants based on the existence of an actual agency relationship.

151. In addition to being independently liable, each of the LQ Defendants is vicariously liable for the conduct of each of the other LQ Defendants because they were operating as part of a joint venture.

**DAMAGES**

152. Franchisor Defendants and Franchisee Defendants' acts and omissions, individually and collectively, caused K.S. to sustain legal damages.

153. Franchisor Defendants and Franchisee Defendants are joint and severally liable for all past and future damages sustained by K.S.

154. K.S. is entitled to be compensated for personal injuries and economic damages, including:

   a. Actual damages;

   b. Direct damages;

   c. Incidental and consequential damages;

   d. Mental anguish and emotional distress damages (until trial and in the future);

   e. Lost earning capacity in the future;

   f. Loss of self-esteem and self-worth;

   g. Necessary medical expenses;

52

h. Physical pain and suffering;

i. Physical impairment;

j. Emotional impairment;

k. Unjust enrichment; and

l. Penalties.

155. K.S. is entitled to exemplary damages.

156. K.S. is entitled to treble damages.

157. K.S. is entitled to recover attorneys' fees and costs of court.

158. K.S. is entitled to pre- and post-judgment interest at the maximum legal rates.

159. A constructive trust should be imposed on Franchisor Defendants and Franchisee Defendants, and the Court should sequester any benefits or money wrongfully received by Franchisor Defendants or Franchisee Defendants for the benefit of K.S.

## **DISCOVERY RULE**

To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed.

## JURY TRIAL

160.   K.S. demands a jury trial on all issues.

## RELIEF SOUGHT

161.   Wherefore, K.S. respectfully requests judgment against Franchisor Defendants and Franchisee Defendants, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

**LOCKS LAW FIRM PLLC**

Janet C .Walsh, Esq.
jwalsh@lockslaw.com
622 Third Avenue, 7th Floor
New York, NY 10017
Phone: (212) 838-3333

**PROVOST ✶ UMPHREY LAW FIRM**

CHRIS KIRCHMER (admitted *pro hac vice*)
ckirchmer@pulf.com
FABIANA BAUM (admitted *pro hac vice*)
fbaum@pulf.com

350 Pine Street, Ste. 1100
Beaumont, TX 77701
Phone:  409/838-8881

**PROVOST ✶ UMPHREY LAW FIRM**

MATTHEW MATHENY (*pro hac vice* pending)
mmatheny@pulf.com

350 Pine Street, Ste. 1100
Beaumont, TX 77701
Phone:  409/838-8881

**ANNIE MCADAMS, PC**

ANNIE MCADAMS (*pro hac vice* pending)
1150 Bissonnet
Houston, TX 77005
Phone: 713/785-6262
Fax: 866/713-6141
annie@mcadamspc.com